## UNITED STATES DISTRICT COURT FOR THE

## NORTHERN DISTRICT OF ILLINOIS

-----------------------------------------x

|  |  |
|---|---|
| EDWARD J. DABROWSKI, individually and on behalf of all others similarly Situated, | **C.A. No. _____** |
| Plaintiff, | |
| -against- | |
| SMURFIT-STONE CONTAINER CORPORATION, RALPH F. HAKE, PATRICK J. MOORE, TIMOTHY J. BERNLOHR, TERRELL K. CREWS, EUGENE I. DAVIS, MICHAEL E. DUCEY, JONATHAN F. FOSTER, ERNST A. HABERLI, JAMES J. O'CONNOR, ROCK-TENN COMPANY, and SAM ACQUISITION, LLC, | <u>CLASS ACTION</u><br><br>COMPLAINT FOR BREACH OF FIDUCIARY DUTY |
| Defendants. | |

-----------------------------------------x

### <u>CLASS ACTION COMPLAINT</u>

Plaintiff Edward J. Dabrowski ("Plaintiff"), on behalf of himself and all other similarly situated public shareholders of Smurfit-Stone Container Corporation (hereafter, "Smurfit-Stone" or the "Company") (the "Class"), brings the following Class Action Complaint against the members of the Board of Directors ("Board") of Smurfit-Stone for breaching their fiduciary duties and against Rock-Tenn Company and Sam Acquisition, LLC, for aiding and abetting the same. The Complaint's allegations are based on the knowledge of Plaintiff as to himself, and on information and belief, including the investigation of counsel and review of publicly available information, as to all other matters.

1

**NATURE OF THE ACTION**

1.    This is a shareholder class action brought by Plaintiff on behalf of common stockholders of Smurfit-Stone to enjoin and/or seek damages resulting from the proposed cash-and-stock transaction of the publicly owned shares of Smurfit-Stone common stock by Rock-Tenn, as detailed herein (the "Proposed Transaction"). The Proposed Transaction is valued at approximately $3.5 billion.

2.    In pursuing this unlawful plan to sell Smurfit-Stone for inadequate consideration, each of the Defendants breached and/or aided and abetted the other Defendants' breaches of their fiduciary duties of loyalty, due care, good faith and fair dealing.

3.    Accordingly, this action seeks: (a) equitable relief compelling the Board to properly exercise its fiduciary duties to Smurfit-Stone's shareholders and to enjoin the close of the Proposed Transaction in order to prevent irreparable harm to Plaintiff and the Class members and (b) monetary damages for Plaintiff and the Class.

**JURISDICTION AND VENUE**

4.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332(a) because the amount in controversy exceeds $75,000.00 and it is between citizens of different states.

5.    Venue is proper in this Court pursuant to 28 U.S.C. §1391(a)(1) because Smurfit-Stone resides in this district, pursuant to 28 U.S.C. §1391(a)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this district, and pursuant to 28 U.S.C. §1391(a)(3) because Smurfit-Stone and the Individual Defendants are subject to personal jurisdiction in this district.

## THE PARTIES

6.      Plaintiff is a resident of Massachusetts who is a stockholder of Smurfit-Stone and has held shares at all times relevant to this Action.

7.      Defendant Smurfit-Stone is a Delaware corporation with its principal executive offices located at 222 N. LaSalle Street, Chicago, Il 60601.  Smurfit-Stone manufactures paperboard and paper-based packaging.  The Company produces containerboard, corrugated containers, kraft paper, bleached paperboard and market pulp, and collects recycled paper.  In December 2009, the Company filed a Chapter 11 plan and disclosure statement in Delaware bankruptcy court.  In July 2010, the Company completed its financial restructuring and officially emerged from Chapter 11.  The Company's stock is listed on the New York Stock Exchange ("NYSE") under the symbol "SSCC."  Smurfit-Stone has a total market capitalization of approximately $3.6 billion.

8.      Defendant Ralph F. Hake ("Hake") serves as the Company's non-executive Chairman of the Board of the Directors ("Board").  Hake is a resident of Nevada.

9.      Defendant Patrick J. Moore ("Moore") serves as the Company's Chief Executive Officer and also serves as a Director of the Company.  Moore is a resident of Missouri.

10.      Defendant Timothy J. Bernlohr ("Bernlohr") serves as a Director of Smurfit-Stone.  Bernlohr is a resident of Pennsylvania.

11.      Defendant Terrell K. Crews ("Crews") serves as a Director of Smurfit-Stone.  Crews is a resident of Missouri.

12.      Defendant Eugene I. Davis ("Davis") serves as a Director of Smurfit-Stone.  Davis is a resident of New Jersey.

13.      Defendant Michael E. Ducey ("Ducey") serves as a Director of Smurfit-Stone.

Ducey is a resident of South Carolina.

14.     Defendant Jonathan F. Foster ("Foster") serves as a Director of Smurfit-Stone. Foster is a resident of New York.

15.     Defendant Ernst A. Haberli ("Haberli") serves as a Director of Smurfit-Stone. Heberli is a resident of Illinois.

16.     Defendant James J. O'Connor ("O'Connor") serves as a Director of Smurfit-Stone.  O'Connor is a resident of Illinois.

17.     Defendants Hake, Moore, Bernlohr, Crews, Davis, Ducey, Foster, Haberli and O'Connor are collectively referred to hereinafter as the "Individual Defendants."

18.     As Directors of Smurfit-Stone, each of the Individual Defendants has the highest fiduciary duties of good faith, loyalty, fair dealing, due care, and candor to Plaintiff and to the other members of the class.  The Individual Defendants are fiduciaries to the Company's shareholders requiring them to exercise their best judgment, and to act in a prudent manner and in the best interests of the Company's shareholders.

19.     Defendant Rock-Tenn Corporation is a Georgia corporation with its principal executive office at 504 Thrasher Street, Norcross, Georgia 30071.  Rock-Tenn Corporation manufactures packaging, including folding cartons, as well as recycled paperboard, and specialty corrugated packaging and display products, with annual net sales of $3 billion.  It has manufacturing operations throughout the United States, Canada, and Mexico.  Its stock is listed on the NYSE under the symbol "RKT."

20.     Defendant Sam Transaction, LLC ("Merger Sub") is a Delaware Limited Liability Company and a wholly-owned subsidiary of Rock-Tenn that was created for the purpose of effectuating the Proposed Transaction.

21.     The Defendants Rock-Tenn Corporation and Sam Transaction, LLC are collectively referred herein to as "Rock-Tenn" unless otherwise indicated and are named as Defendants herein because they are parties to the Merger Agreement and for aiding and abetting the Smurfit-Stone Board's breaches of fiduciary duties.

22.     The Individual Defendants, together with Defendants Smurfit-Stone and Rock-Tenn, are collectively referred to herein as "Defendants."

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

23.     Where the directors of a publicly-traded corporation undertake a transaction that will result in either (i) a change in corporate control, or (ii) a break-up of the corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders, and if such transaction will result in a change of corporate control, the shareholders are entitled to receive a significant premium.  To diligently comply with these duties, the directors and/or officers may not take any action that:

a.      adversely affects the value provided to the corporation's shareholders;

b.      will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

c.      contractually prohibits themselves from complying with their fiduciary duties;

d.      will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

e.      will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

24.     In accordance with their duties of loyalty and good faith, the Individual

Defendants, as Directors and/or officers of Smurfit-Stone, are obligated to refrain from:

a.      participating in any transaction in which the directors' or officers' loyalties are divided;

b.      participating in any transaction in which the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

c.      unjustly enriching themselves at the expense or to the detriment of the public shareholders.

25.      Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, are knowingly or recklessly violating their fiduciary duties, including their duties of loyalty, good faith, and independence owed to Plaintiff and other public shareholders of Smurfit-Stone. The Individual Defendants are engaging in self-dealing, are obtaining for themselves personal benefits not shared equally by Plaintiff and the Class, and are choosing not to provide shareholders with all information necessary to make an informed decision in connection with the Proposed Transaction. As a result of the Individual Defendants' self-dealing and divided loyalties, neither Plaintiff nor the Class members are being treated fairly in connection with the Proposed Transaction.

26.      The Individual Defendants also owe the Company's shareholders a duty of candor, which includes the disclosure to the Plaintiff and the Class members of all material facts concerning the Proposed Transaction and, particularly, concerning the fairness of the price offered for the shareholders' equity interest. Defendants are knowingly or recklessly breaching their fiduciary duties of candor and good faith by approving the Proposed Transaction and recommending that Smurfit-Stone shareholders support it, while failing to disclose all material

information concerning the Proposed Transaction and failing to explain its merits in light of the substantial red flags, negative facts, and shareholder concerns outlined herein, and/or are aiding and abetting other Defendants' breaches.

## SUBSTANTIVE ALLEGATIONS

**A.** **Smurfit-Stone's Emergence From Chapter 11 And Strong Business Performance**

27.    According to Smurfit-Stone's Form 10-K for the year ended December 31, 2009 (the "2009 10-K"), its operations include 12 paper mills (10 of which are in the U.S.), 110 container plants (90 in the U.S.), 29 reclamation plaints (all in the U.S.), one lamination plant (outside the U.S.) and wood harvesting facilities (inside and outside the U.S.). Smurfit-Stone produces a full range of corrugated containers designed to protect, ship, store and display products made to the merchandising and distribution specifications of its customers, which include a broad range of consumer goods manufacturers. As stated in the 2009 10-K:

> Corrugated containers are used to transport such diverse products as home appliances, electric motors, small machinery, grocery products, produce, books and furniture. We provide customers with innovative packaging solutions to advertise and sell their products. In addition, we manufacture and sell a variety of retail ready, point of purchase displays and a full line of specialty products, including pizza boxes, corrugated clamshells for the food industry, Cordeck® recyclable pallets and custom die-cut boxes to display packaged merchandise on the sales floor. We also provide custom, proprietary and standard automated packaging machines, offering customers turn-key installation, automation, line integration and packaging solutions. Our container plants serve local customers and large national accounts. Net sales of corrugated containers for 2009…represented 71%...of our total net sales.

28.    As stated in the 2009 10-K, the Company's containerboard mills produce a full line of containerboard, used primarily in corrugated packaging production, including 3,395,000 tons of unbleached kraft linerboard, 794,000 tons of white top linerboard and 1,844,000 tons of medium in 2009. In 2009, its corrugated container plants consumed 4,406,000 tons of containerboard. Net sales of containerboard to third parties represented 17%

of Smurfit-Stone's total net sales in 2009. In addition, Smurfit-Stone's "paper mills also produce market pulp, solid bleached liner (SBL), kraft paper, and other specialty products. We produce southern hardwood pulp, bleached southern softwood pulp and fluff pulp, which are sold to manufacturers of paper products, including specialty papers, as well as the printing and writing sectors. Kraft paper is used in numerous products, including consumer and industrial bags, grocery and shopping bags, counter rolls, handle stock and refuse bags."

29. The 2009 10-K also stated that Smurfit-Stone's reclamation operations procure fiber resources for its paper mills and other producers. The Company operates 29 reclamation facilities that collect, sort, grade and bale recovered paper, and it collects aluminum and plastics for resale to manufacturers. In addition, it operates a nationwide brokerage system whereby it purchases and resells recovered paper to its recycled paper mills and other producers on a regional and national contract basis. In 2009, its paper mills consumed 1,952,000 tons of the fiber reclaimed and brokered by its reclamation operations, representing an integration level of approximately 38%.

30. The Company's customer base and revenue stream are well-diversified. As stated in the 2009 10-K:

> We serve a broad customer base. We serve thousands of accounts from our plants and sell packaging and other products directly to end users and converters, as well as through resellers. Our corrugated container sales organization is centralized with sales responsibilities for all converting plants. This allows us to better focus on revenue growth and assign the appropriate resources to the best opportunities. Marketing of containerboard and pulp to third parties is centralized in our board sales group. Total tons of containerboard and market pulp sold to third parties in 2009…were 2,245,000… . Our business is not dependent upon a single customer or upon a small number of major customers. We do not believe the loss of any one customer would have a material adverse effect on our business.

Moreover, "Demand for our major product lines is relatively constant throughout the year, and seasonal fluctuations in marketing, production, shipments and inventories are not significant."

31.     As stated in the Company's Form 10-Q for the quarter ended September 30, 2010 (the "Q3 2010 10-Q"), Smurfit-Stone and its U.S. and Canadian subsidiaries filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code ("Chapter 11") in the United States Bankruptcy Court in Wilmington, Delaware on January 26, 2009.  On June 21, 2010, the Bankruptcy Court entered an order approving and confirming the Joint Plan of Reorganization and Plan of Compromise and Arrangement for its Canadian subsidiaries (the "Plan of Reorganization").  On June 30, 2010, the Company emerged from Chapter 11, and pursuant to the Plan of Reorganization, it merged with and into its wholly-owned subsidiary Smurfit-Stone Container Enterprises, Inc., which in turn changed its name to Smurfit-Stone Container Corporation and became the Reorganized Smurfit-Stone Container Corporation.

32.     In a press release filed with the Securities and Exchange Commission ("SEC") on July 7, 2010, Defendant Moore, Smurfit-Stone's CEO, exclaimed, "This is an exciting day for Smurfit-Stone. We have successfully completed our financial restructuring in just 17 months and we exit Chapter 11 as a well-positioned industry leader with a healthier balance sheet and improved cost structure.  We are re-energized, committed to serving the needs of our customers and achieving long-term profitable growth for our shareholders."

33.     His expressions of optimism continued a month later, when Smurfit-Stone announced its second quarter 2010 results.  In a press release dated August 3, 2010 and filed with the SEC that day as an attachment to a Form 8-K, Moore was quoted as saying:

> We believe our successful financial restructuring positions us for long-term profitable growth. We will continue to focus on what matters - serving our customers, improving margins and delivering shareholder value. Looking ahead, we are confident that continued high operating rates, productivity improvements, higher average prices, and low inventories combined with assumed stable demand will drive significant earnings improvement in the second half of the year.

34.     Moore's Moore's optimistic statements accompanied the Company's strong reported operating performance in the same quarter as it emerged from Chapter 11.  The press release contained unaudited financials for the second quarter of 2010, which indicated that the Company had: (a) net sales of $1.563 billion for the three months ending June 30, 2010, as compared to $1.461 billion for the three months ending March 31, 2010 and $1.407 billion for the three months ending June 30, 2009, and (b) a net loss (before reorganization items and income taxes) of just $5 million for the three months ending June 30, 2010, as compared to a $48 million loss for the three months ending March 31, 2010.  The same press release touted as "Second-Quarter 2010 Highlights" that "The Company successfully emerged from its financial reorganization on June 30 with a significant reduction in leverage and a strong liquidity position" and "Operating results improved significantly due to steady demand improvement, higher capacity utilization, and improved selling prices," among others.

35.     On November 1, 2010, in a press release that was filed with the SEC as an attachment to a Form 8-K, Smurfit-Stone released unaudited financials for the third quarter of 2010, which indicated that the Company had: (a) net sales of $1.634 billion for the three months ending September 30, 2010, as compared to $1.563 billion for the three months ending June 30, 2010 and $1.417 billion for the three months ending September 30, 2009, and (b) net income (before reorganization items and income taxes) of $121 million for the three months ending June 30, 2010, as compared to a $5 million loss for the three months ending June 30, 2010.  Moreover, adjusted EBITDA for the third quarter of 2010 was $239 million, up from $102 million in the second quarter of 2010, and $94 million in the third quarter of 2009.  The Company attributed its improved EBITDA to "higher selling prices, reduced maintenance-related downtime and related expenses, lower fiber costs, and improvements in

overall operating productivity…"

36.     The Company's string of strong post-bankruptcy results continued in the fourth quarter of 2010.  In a press release dated January 23, 2011, which it filed with the SEC as an attachment to a Form 8-K on January 24, 2011, Smurfit-Stone reported net income of $49 million, or $0.49 per diluted share, for the fourth quarter ended December 31, 2010, compared with a net loss attributable to common stockholders of ($6) million, or ($0.02) per share, for the fourth quarter of 2009.  Its adjusted EBITDA for the fourth quarter of 2010 was $205 million, up from $67 million in the fourth quarter of 2009. Defendant Moore once again commented on the positive outlook, stating, "Fourth quarter performance was strong, meeting our expectations, and demonstrating that our initiatives to improve productivity and lower costs are enabling us to deliver improvement in earnings, margins and cash flow."

37.     However, rather than permitting the Company's shares to continue to trade freely or growing the business through the Plan of Reorganization and improved capital structure, the Individual Defendants, by entering into the Merger Agreement, effectively capped Smurfit-Stone's price at a time when the Company's stock was just recovering from 'recessionary aftershocks' and when it was poised to capitalize on its re-stabilized and encouraging financial outlook.  In doing so, the Individual Defendants acted for their own benefit and the benefit of Rock-Tenn, and to the detriment of the Company's shareholders.

**B.     The Proposed Transaction – A Key Strategic Acquisition for Rock-Tenn**

38.     On January 23, 2011, Smurfit-Stone and Rock-Tenn jointly announced the Proposed Transaction in a press release which the Company filed with the SEC as an attachment to a Form 8-K.  The press release announced that the Boards at both companies had approved a definitive agreement pursuant to which Smurfit-Stone will become a wholly-owned subsidiary of

Rock-Tenn, for aggregate consideration consisting of 50% cash and 50% Rock-Tenn stock, which was valued at $35 per-share of Smurfit-Stone common stock and gave the transaction an aggregate equity value of approximately $3.5 billion, based on Rock-Tenn's closing price on January 21, 2011. For each share of Smurfit-Stone common stock, Smurfit-Stone stockholders will receive just 0.30605 shares of Rock-Tenn common stock and $17.50 in cash. As part of the deal, Rock-Tenn will assume Smurfit-Stone's net debt and pension liabilities, which the press release said as of December 31, 2010 were purportedly $0.7 billion and $1.1 billion ($0.7 billion after-tax), respectively. The press release stated that the purchase price, inclusive of debt and pension liabilities, represented a multiple of 6.1x Smurfit-Stone's annualized adjusted EBITDA of $820 million for the three months ended December 31, 2010.

39. The press release stated that Smurfit-Stone will become a wholly owned subsidiary of Rock-Tenn, with Rock-Tenn's shareholders set to own approximately 56% of the combined company, which would be "a $9 billion leader in the North American paperboard packaging market." Indeed, it was readily apparent from the January 23, 2011 press release that Rock-Tenn, which will maintain its Georgia headquarters, was the clear winner and stood to make out amazingly well from the announced merger. Rock-Tenn's Chairman and CEO, James A. Rubright was quoted as saying:

> RockTenn's acquisition of Smurfit-Stone is another major step in our transformation of RockTenn to be the most respected company in our business with a laser focus on exceeding our customers' expectations and creating long term shareholder value. The containerboard and corrugated packaging industry is a very good business and U.S. virgin containerboard is a highly strategic global asset. With this acquisition, RockTenn's fiber input ratio will be 55% virgin and 45% recycled. We believe this transaction provides the greatest possible career opportunities for our co-workers from both companies.

40. The press release also touted Rock-Tenn's post-merger strength, stating, "[W]hen combined, RockTenn will have 9.4 million tons of total production capacity, including 7.5

million tons of mill production in the attractive containerboard market." It also listed more specifically the primary attributes of the combined post-merger company, as follows: (a) it would permit Rock-Tenn to leap the forefront of its industry by "[e]xpand[ing] RockTenn's geographic footprint to the Midwest and West Coast" and making Rock-Tenn the "#2 producer of North American containerboard" and the "#2 producer of coated recycled board"; (b) it would accomplish a key strategic adjustment for the company, making its raw materials consist of a more "[b]alanced fiber input mix with 55% virgin fiber and 45% recycled fiber"; (c) it would permit Rock-Tenn to harvest from Smurfit-Stone its tax assets and the efficiencies to be achieved from further post-bankruptcy streamlining, in that post-merger Rock-Tenn will have an "opportunity to recognize benefits from approximately $500 million of NOLs at Smurfit-Stone," will have a "[c]onservative capital structure with significant liquidity," and will have an "[o]pportunity to improve results through cost reduction and capital investment." The press release also disclosed that Rock-Tenn had received $3.7 billion in committed bank financing, that Wells Fargo had acted as exclusive financial advisor to Rock-Tenn, that Lazard was Smurfit-Stone's financial advisor, and that the transaction was expected to close in the second calendar quarter of 2011.

41. A Rock-Tenn slide presentation entitled "Acquisition of Smurfit-Stone Container Corporation January 24, 2011," which Smurfit-Stone filed with the SEC on January 24, 2011, further touts the primary benefits of the Proposed Transaction for Rock-Tenn's shareholders. First, it underscores that the Proposed Transaction will transform Rock-Tenn into an industry leader overnight. Under the heading "RockTenn will be the most respected company in our business by:" the Rock-Tenn slides list other ways that the Smurfit-Stone acquisition will spur it to the forefront of its industry. For instance, the deal means "investing for competitive

advantage" because "Smurfit-Stone's assets are well-capitalized, with significant identified opportunities for further profit-improving investments." Also, it permits "maximizing the efficiency of our manufacturing processes by optimizing economies of scale." The deal also furthers Rock-Tenn's goal of "systematically improving processes and reducing costs throughout the company" because it "combines RockTenn's Six Sigma continuous improvement method with Smurfit-Stone's Lean Manufacturing method to further optimize manufacturing and administrative processes." It also furthers Rock-Tenn's goal of "seeking acquisitions that can dramatically improve the business" in that the "acquisition brings increased scale and strong nationwide customer relationships and rebalances RockTenn's fiber sourcing."

42. Second, the Rock-Tenn slides explain just how critical the Proposed Transaction is from Rock-Tenn's perspective, vis-à-vis its competitors in that its acquisition of Smurfit-Stone will permit it to control a strategically valuable asset of Smurfit-Stone – access to virgin fiber. One of the reasons the slides had characterized the Proposed Transaction as a "Compelling Strategic Acquisition" was that "US virgin containerboard is a highly strategic global asset." As it turns out, Rock-Tenn is severely deficient in terms of access to this critical asset. As illustrated by the below chart from the Rock-Tenn slides, in 2004, Rock-Tenn's fiber sourcing was 100% recycled, *i.e.* 0% virgin. From 2005-2009, its fiber sourcing vacillated between 72% and 82% recycled. Indeed in the three years before the Proposed Transaction was announced (2008-2010), Rock-Tenn's fiber sourcing was only a flat 18% virgin fiber. However, if the Proposed Transaction closes, Rock-Tenn's fiber sourcing will be rebalanced to 55% virgin and only 45% recycled, a critical strategic balance it was unable to even remotely approach during at least the prior seven years of operations.



43.     Third, the Rock-Tenn slides underscore what a financial windfall the Proposed Transaction will be for Rock-Tenn shareholders, due to the tremendous untapped potential to further streamline Smurfit-Stone operations and grow its post-bankruptcy revenues.  Among other things, the slides boast that the "Transaction is accretive to RockTenn shareholders on a pro forma historical basis – accretion of 16.5% per diluted RockTenn share."  Under the heading "Compelling Strategic Acquisition," they state that "Smurfit-Stone's assets are much lower cost than before their transformation," that there are "[a]mple opportunities to improve cost position through continued transformation of box plant system and investment in mills," and that "[e]stimated transaction synergies run rate of $150 million within 24 months after transaction close."  Under the heading "Well-capitalized, Low-Cost Containerboard Manufacturing Assets," they say "Smurfit-Stone has taken out significant costs over the last three years, with further improvements ahead."  The slides also detail how Smurfit-Stone's significant capital investments have driven huge and ongoing increases in efficiency and earnings, in this chart:



44.    In addition, the Rock-Tenn slides, implying a level of non-public diligence done by the Rock-Tenn board before reaching agreement, make clear that the efficiency and operating costs of Smurfit-Stone's plants are even better than publicly perceived, in this chart:



**C.**    **The Purchase Price in the Proposed Transaction Is Grossly Inadequate**

45.    In light of the foregoing, the per share consideration offered in the Proposed Transaction is unfair and grossly inadequate for several reasons.  First, on its face, the transaction premium for Proposed Transaction is low comparative to recent deals. On December 21, 2009, a Bloomberg article entitled "CEOs paying 56% M&A Premium Shows Stocks May be Cheap," reported that "[t]he average premium in mergers and acquisitions in [2009 in] which U.S. companies were the buyer and seller rose to 56% this year from 47 percent last year [2008]..." Thus, the Proposed Transaction premium (just 27% over the prior day's closing price) is well below the average premium in like transactions during 2009.  Second, the intrinsic value of Smurfit-Stone's common stock is materially in excess of the amount offered, given the Company's recent post-bankruptcy financial performance and its prospects for future growth and earnings.  Third, the Proposed Transaction undervalued Smurfit-Stone when viewed as a specific strategic acquisition by Rock-Tenn (or other industry competitors), given the synergies to be achieved via the combined company and the particular attributes (*e.g.* Smurfit's asset base being 65% based on virgin fiber).

46.    For these reasons, analysts following the Company were underwhelmed by the consideration offered in the Proposed Transaction. For example, Richard Lee, an Investment Banking Analyst for Reuters, asserted that the Smurfit-Stone Board "sold-out too early." Additionally, Lee stated:

> At first glance ... $35 is a great premium. But, it is being sold at 6 x EBITDA, which is not a very big premium in the first place. And secondly, they are projecting EBITDA to grow from $580 million last year to almost $900 million this year. So, they are definitely leaving money on the table here.

47.    Further, the Individual Defendants failed to negotiate any protection against the decline in the Rock-Tenn stock component of consideration offered to Smurfit-Stone

shareholders in the Proposed Transaction, or even the right to terminate the Proposed Transaction in the event Rock-Tenn stock trades below a certain level. If the Proposed Transaction is not enjoined, Smurfit-Stone shareholders are left with Rock-Tenn stock at whatever price it has declined to at the time of closing, even if that price reflects a significant discount to the price at the time of deal announcement.

## D.   **Personal Benefits Biased the Individual Defendants to Favor The Proposed Transaction**

48.     In addition to the inadequacy of the consideration offered to Smurfit-Stone's shareholders, the process that led to the Proposed Transaction suffered from disabling conflicts of interest.  Pursuant to §3(c)(ii)-(iii) of his Amended and Restated Employment Agreement, dated June 30, 2010 and filed with the SEC that day as an exhibit to a Form 8-K, Defendant Moore, Smurfit-Stone's outgoing CEO, was entitled to generous "Change-in-Control Payments" described as follows:

> (c) <u>Special Annual Incentive and Change-in-Control Payments</u>.  Subject to the terms and conditions of this Agreement…and provided that the Executive complies with his obligations under this Agreement…and the Executive's employment has not terminated for Cause or without Good Reason (each as defined in this Agreement):

> * * *

> (ii)  in the event (A) of a Change in Control (as defined in this Agreement) during the Employment Period or (B) that, at any time prior to the Retirement Date, the Company receives an offer from a third party to purchase the Company or enter into any other transaction(s) that would constitute a Business Combination (as defined in this Agreement) that results in a Change in Control at any time within fifteen months after the Effective Date (and provided that the Executive participated in the efforts to sell the Company or to otherwise effectuate the Business Combination), the Company shall pay to the Executive, within thirty calendar (30) days after the Change in Control, an additional lump sum amount equal to (X) the monetary value of equity that the individual holding the positions of President and Chief Operating Officer ("COO") of the Company as of the Effective Date would receive if all of the equity-based compensation that such President and COO received pursuant to and in accordance with the Company's Plan of Reorganization (i.e., that pursuant to the Plan of Reorganization, the

President and COO will receive 0.9% of the common shares of the Company issued on the Effective Date on a fully diluted basis, allocated in a restricted stock unit award with respect to 0.22% of such common shares and in an award granting options to acquire 0.68% of such common shares) were fully vested and liquidated at the Change in Control Value (as defined below) reduced by (Y) the amount of the Special Annual Incentive Payment; and

(iii) for purposes of Section 3(c)(ii): (A) "Change in Control Value" means the consideration paid or payable or the value received or receivable with respect to a share of common stock of the Company in connection with the Change in Control (as reasonably determined by the Company), multiplied by the number of shares of common stock, common stock units, or common stock equivalents held by the President and COO of the Company as of the Effective Date; and (B) in the case of an option, stock appreciation right or the equivalent, "Change in Control Value" means the amount described in the preceding Section 3(c)(iii)(A), reduced by the exercise price or strike price of the option, stock appreciation right or the equivalent.

49. On its face, this provision would have netted Defendant Moore no additional compensation (a) had he not participated in efforts to sell Smurfit-Stone that resulted in (b) a change-in-control offer being made by a third party prior to Moore's retirement (c) for a transaction that closed before September 30, 2011. So, for instance, had Smurfit-Stone waited to close on a merger at any point in time from October 1, 2011 onward, it would have owed Defendant Moore nothing under these provisions. Instead, he will receive millions of dollars of additional change-in-control compensation because of the Proposed Transaction.

50. Furthermore, pursuant to §1.13 of the Merger Agreement, which the Company filed with the SEC on January 23, 2011 as an attachment to a Form 8-K, the Rock-Tenn Board will be increased by three members, with such positions to be filled by individuals designated by the Smurfit-Stone Board upon consummation of the Proposed Transaction. Thus, three members of the Smurfit-Stone Board, as yet to be determined, will not only cash out their Company shares, but will also maintain employment at the combined company.

**E.** **Preclusive Deal Protection Devices Further Disadvantage Smurfit-Stone Shareholders**

51. To the further detriment of Smurfit-Stone's shareholders, Defendants agreed to

certain onerous and preclusive deal protection devices that operate to ensure that no competing offers will emerge for the Company. First and foremost, Merger Agreement §8.2 provides that if Smurfit-Stone were to terminate the Merger Agreement in order to enter into a definitive agreement concerning a "Company Superior Proposal," it would have to pay Rock-Tenn an outrageous termination fee of $120 million. This provision all but ensures that no rival bid will surface for Smurfit-Stone, solicited or unsolicited.

52.     Even assuming that a rival suitor were not completely turned away by this fee in theory, §6.4 of the Merger Agreement, titled "No Solicitation," contains onerous provisions barring the Board and any Company personnel from in any way trying to identify a willing bidder from whom the Company could procure a price in excess of the amount offered by Rock-Tenn. Specifically, that restrictive section, which operates to the clear detriment of Smurfit-Stone's shareholders, reads in part as follows:

> (a)     Upon execution of this Agreement, the Company and its Subsidiaries shall, and shall cause their respective Representatives to, cease and terminate any and all existing activities, discussions or negotiations with any Person with respect to a Company Acquisition Proposal. The Company shall promptly after the date of this Agreement instruct each Person which has heretofore executed a confidentiality agreement relating to a Company Acquisition Proposal with or for the benefit of the Company to promptly return or destroy all information, documents, and materials relating to the Company Acquisition Proposal or to the Company or its businesses, operations or affairs heretofore furnished by the Company or any of its Representatives to such Person or any of its Representatives in accordance with the terms of any confidentiality agreement with such Person.

> (b)     Except as provided in Section 6.4(c), the Company agrees that neither it nor any of its Subsidiaries shall, and that it shall not authorize or permit any of its and their respective Representatives to, directly or indirectly, (i) initiate, solicit, induce or knowingly encourage or facilitate the submission of any inquiry, indication of interest, proposal or offer that constitutes, or may lead to, a Company Acquisition Proposal, (ii) participate in any discussions or negotiations regarding any Company Acquisition Proposal, (iii) furnish any information or data regarding the Company or any of its Subsidiaries to, or afford access to the properties, books and records of the Company to, any Person (other than Parent or

Merger Sub) in connection with or in response to any Company Acquisition Proposal, (iv) enter into any letter of intent or Contract providing for, relating to or in connection with, any Company Acquisition Proposal or any proposal that may lead to a Company Acquisition Proposal (other than a confidentiality agreement as contemplated by <u>Section 6.4(c)</u>), or that requires the Company to abandon, terminate or breach its obligations hereunder or fail to consummate the transactions contemplated hereby, (v) approve, adopt, endorse or recommend a Company Acquisition Proposal, (vi) take any action to make the provisions of any "fair price," "moratorium," "control share acquisition," "business combination" or other similar anti-takeover statute or regulation (including any transaction under, or a third party becoming an "interested shareholder" under, Section 203 of the DGCL), or any restrictive provision of any applicable anti-takeover provision in the Company's Certificate of Incorporation or Bylaws, inapplicable to any transactions contemplated by a Company Acquisition Proposal (and, to the extent permitted thereunder, the Company shall promptly take all steps necessary to terminate any waiver that may have been heretofore granted, to any Person other than Parent or any of Parent's Affiliates, under any such provisions) or (vii) resolve, propose or agree to do any of the foregoing.

53.     The remainder of Merger Agreement §6.4 acts to ensure that, even if a rival bidder theoretically were to surface notwithstanding the contractual bar preventing the Company and its employees from identifying such a suitor, Rock-Tenn would nevertheless acquire the Company.  For instance, pursuant to Merger Agreement §6.4(f), Smurfit-Stone is required to notify Rock-Tenn within 24 hours, both orally and in writing, of its "receipt of any *bona fide* inquiries, discussions, negotiations, proposals or expressions of interest with respect to a Company Acquisition Proposal"; must disclose the identities of the third parties making the inquiry/offer; and must provide Rock-Tenn with copies of all documentation thereof.  Pursuant to Merger Agreement §6.4(e), Rock-Tenn is entitled to a three-day period within which to make a counter-offer that would trump any unsolicited "Superior Proposal."

54.     Rock-Tenn will of course be able to match any such unsolicited offer because it is contractually granted unfettered access to the details of the unsolicited offer, in its entirety, thereby eliminating any leverage that Smurfit-Stone would have as a result of receiving the unsolicited offer.  Thus, to the extent that the Merger Agreement even arguably permits an

'auction,' if one were to somehow arise, the cards are stacked in favor of Rock-Tenn's emerging the winner, by piggy-backing on the due diligence of the foreclosed second bidder and offering up the minimum additional consideration necessary to supersede its offer. Effectively, these provisions act to dissuade any potential rivals from making a meaningful bid in the first place.

55.     Indeed, in its Form 10-K for the fiscal year ended December 31, 2010, filed with the SEC on February 15, 2011 (the "2010 10-K"), the Company essentially admitted that the foregoing provisions, including the onerous termination fee, will dissuade potential rival suitors and therefore will prevent it from maximizing shareholder value through a change of control transaction. The 2010 10-K, in a section detailing extensive "Rock-Tenn Merger Agreement Risk Factors," included the following (emphasis added):

> **The Merger Agreement limits our ability to pursue an alternative acquisition proposal to the Merger and requires Smurfit-Stone to pay a termination fee of $120 million if it does.**
>
> The Merger Agreement prohibits Rock-Tenn and us from soliciting, initiating, encouraging, or facilitating certain alternative acquisition proposals with third parties, subject to exceptions set forth in the Merger Agreement. The Merger Agreement also provides that we are required to pay a termination fee of $120 million if the Merger Agreement is terminated under certain circumstances in connection with a third party initiating a competing acquisition proposal for Smurfit-Stone. ***These provisions limit our ability to pursue offers from third parties that could result in greater value to our stockholders*** than the value resulting from the Merger. ***The termination fee may also discourage third parties from pursuing an acquisition proposal*** with respect to Smurfit-Stone.

56.     Ultimately, these preclusive deal protection devices, independently and in conjunction with one another, illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. Even assuming a potential bidder could stomach the $120 million termination fee that would be charged to the Company, the circumstances under which the Board may respond to an

unsolicited alternative acquisition proposal that constitutes, or would reasonably be expected to constitute, a superior proposal are too narrowly defined to provide an effective "fiduciary out." Likewise, these provisions will foreclose the new bidder from providing the needed market check of Rock-Tenn's inadequate offer. Thus, Plaintiff seeks injunctive relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

**E.** **Smurfit-Stone Shareholders Voice Outrage At the Proposed Transaction**

57. The Company has stated its intent to file a registration statement on Form S-4 and related proxy statement/prospectus materials in the near future. However, even before such materials have been made public, a shareholder backlash has already begun. Investment funds claiming to own 9% of Smurfit-Stone's outstanding common stock (96% of which they owned before the Proposed Transaction was announced) wrote a scathing letter to the Board dated February 2, 2011, that was publicly disclosed, in which they expressed their intention to vote against the Proposed Transaction (the "Shareholder Concerns Letter"). The signatories were Third Point LLC, Royal Capital Management, L.L.C., and Monarch Alternative Capital LP (together, the "Dissenting Shareholders").

58. The Shareholder Concerns Letter expresses the Dissenting Shareholders' "belie[f] that the acquisition by Rock-Tenn substantially undervalues the Company and we are acutely disappointed that the Board of Directors is willing to throw in the towel on the significant upside inherent in the Company's assets." It continues, "To add insult to injury, it appears that the Company did not run a sale process, apparently in violation, or at least in ignorance, of your duties to shareholders to seek the best price available. …[W]e cannot help but wonder whether Mr. Patrick Moore's employment contract, which is set to expire on March 31st of 2011, played any part in pushing for this sale, given that he personally stands to earn a windfall in excess of

$15 million as a result of the Merger." It points to the fact that Rock-Tenn's stock price was trading up 18% since the announcement as an indication that the market believes Rock-Tenn "is getting a steal." It also sets forth five reasons why "The Proposed Transaction Represents a Significant Discount to Precedent Valuations."

59. First, it indicates that the Proposed Transaction might have a Total Enterprise Value to Adjusted EBITDA multiple of 5.1x, instead of the 6.1x announced multiple, because: (a) Rock-Tenn failed to account for the Company's sizable existing net operating loss ("NOL") asset of $500 million (worth ~$190 million, or ~$1.88 per share on a 'tax effected basis') or its potential $650 million additional NOLs (which would be worth ~$250 million more, or ~$2.45 per share on a 'tax effected basis') and (b) Rock-Tenn admittedly used the Company's "seasonally weakest" fourth quarter of $205 million in adjusted EBITDA to annualize Smurfit-Stone's "run rate" at $820 million instead of a more appropriate $938 million figure that was estimated by a Goldman Sachs analyst in a January 9, 2011 report.

60. Second, whether the multiple is 5.1x or 6.1x, the Shareholder Concerns Letter argues that it is too low. It indicates that Lazard, the Board's financial advisor, had testified in the summer of 2010 during Smurfit-Stone's bankruptcy plan confirmation hearing that precedent containerboard transactions over the last decade had a median ratio of 7.7x. Such a multiple, combined with the EBITDA calculations discussed above, would yield a $59 per share price.

61. Third, the Shareholder Concerns Letter questions the sales process, pointing to comments by Rock-Tenn's CEO that "this transaction was exclusively negotiated on a one-on-one basis" and that Rock-Tenn "[doesn't] like to do transactions that are in a process" as pre-proxy indications that there was no competitive bidding process employed. It points to Defendant Moore's change of control payment, which it calculated as being as high as $19

million, and the fact that Smurfit-Stone's officers will receive $42 million related to the merger, as reasons why they were incentivized to sell the Company so quickly on the cheap.

62.     Fourth, the Shareholder Concerns Letter points out that Smurfit-Stone, at worst, could have remained a standalone enterprise which, if managed properly, could have eliminated inefficiencies (such as having two headquarters), increased margins, and developed its own valuable assets.  As evidence of this standalone potential, the Shareholder Concerns Letter points to Rock-Tenn's CEO's comment that "the opportunities for…investments in the Smurfit mill system are basically unlimited with very, very high paybacks" and his remarks that rising interest rates could cause Smurfit-Stone's underfunded pension plan to rebound with a far lower capital contribution that currently calculated.

63.     Finally, the Shareholder Concerns Letter indicates that Rock-Tenn's status as a 'forced buyer' of strategically valuable virgin fiber capacity, which constitutes 65% of Smurfit-Stone's asset base, along with the considerable synergies of a potential combined company, should have forced Rock-Tenn to pay a substantially higher premium than that which is set forth in the Merger Agreement.

64.     For such a strong, coherent, extensive and material opposition to the Proposed Transaction to have emerged in such a short period of time, even before any proxy materials have even been made public, is striking.  It is further indication that the Proposed Transaction disadvantages Smurfit-Stone shareholders and is the result of the breaches of fiduciary duty alleged herein.

65.     Moreover, instead of answers, Smurfit-Stone shareholders are being served even more questions about the validity of the merger through the Company's most recent public statements.  For instance, the 2010 10-K, filed February 15, 2010, sets out a litany of potential

obstacles to the merger that would prevent it from achieving the purported benefits to Smurfit-Stone's shareholders. Specifically, the 2010 10-K states:

**If the Merger is completed, the combined company may not be able to successfully integrate the business of the Company and Rock-Tenn and therefore may not be able to realize the anticipated benefits of the Merger.**

At the effective time of the Merger, each share of our common stock issued and outstanding immediately prior to the effective time of the Merger will be converted into the right to receive $17.50 in cash and 0.30605 of a share of Rock-Tenn Class A common stock, par value $0.01 per share (collectively, the "Merger Consideration").

Because a portion of the Merger Consideration consists of Rock-Tenn common stock, realization of the anticipated benefits in the Merger will depend, in part, on the combined company's ability to successfully integrate the businesses and operations of Rock-Tenn and us. The combined company will be required to devote significant management attention and resources to integrating its business practices, operations, and support functions. The challenges the combined company may encounter include the following:

- combining diverse product and service offerings, customer plans, and sales and marketing approaches;

- preserving customer, supplier, and other important relationships and resolving potential conflicts that may arise as a result of the merger;

- consolidating and integrating duplicative facilities and operations, including back-office systems;

- addressing differences in business cultures, preserving employee morale, and retaining key employees while maintaining focus on providing consistent, high-quality customer service and meeting its operational and financial goals; and

- adequately addressing business integration issues.

The process of integrating Rock-Tenn's and our operations could cause an interruption of, or loss of momentum in, the combined company's business and financial performance. The diversion of management's attention and any delays or difficulties encountered in connection with the Merger and the integration of the two companies' operations could have an adverse effect on the business, financial results, financial condition, or stock price of Rock-Tenn (as the combined company following the Merger). The integration process may also result in additional and

unforeseen expenses. There can be no assurance that the contemplated expense savings and synergies anticipated from the merger will be realized.

66.     In light of all the foregoing, the injunctive relief sought herein is appropriate and necessary in order to protect the rights of Plaintiff and the Class of Smurfit-Stone shareholders he seeks to represent.

## CLASS ACTION ALLEGATIONS

67.     Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(a) and (b)(2) and (b)(3), individually and on behalf of all other common stockholders of Smurfit-Stone who are or will be harmed by Defendants' wrongful actions, as more fully described herein (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with them and their successors in interest.

68.     This action is properly maintainable as a class action.

69.     The Class is so numerous that joinder of all members is impracticable. According to Smurfit-Stone's public filings, there are approximately 91 million shares of Smurfit-Stone common stock outstanding.  The actual number of shareholders of Smurfit-Stone is believed to be in the thousands and will be ascertained through discovery.

70.     There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member.  The common questions include the following:

A.      whether defendants have breached their fiduciary duties to the Class  in connection with the Proposed Transaction;

B.      whether the Individual Defendants have breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of plaintiff and the other members of the Class in connection with the Proposed Transaction;

C.  whether defendants have breached any of their other fiduciary duties to plaintiff and the other members of the Class in connection with the Proposed Transaction, including the duties of good faith, diligence, honesty and fair dealing;

D.  whether the defendants have improperly impeded or erected barriers to discourage other offers for the Company or its assets; and

E.  whether plaintiff and the other members of the Class would suffer irreparable injury were the transactions complained of herein consummated.

71.  Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

72.  Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature who will fairly and adequately protect the interests of the Class.

73.  The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

74.  Plaintiff anticipates no difficulty in the management of this litigation as a class action.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

75.  Defendants have acted, or refused to act, on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT I

### BREACH OF FIDUCIARY DUTY
**(Against Smurfit-Stone and the Individual Defendants)**

76.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

77.     The Individual Defendants have violated their fiduciary duties of care, good faith loyalty, and candor owed to the public shareholders of Smurfit-Stone.

78.     By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and the other Class members of the best reasonably available transaction in exchange for their investment in Smurfit-Stone.

79.     The Individual Defendants have violated their fiduciary duties by entering into a transaction with the Rock-Tenn without regard to the fairness of the transaction to Smurfit-Stone shareholders.

80.     The Individual Defendants failed to exercise the care required, and breached their duties of loyalty and good faith, owed to the shareholders of Smurfit-Stone because, among other reasons:

a.      they failed to take steps to maximize the value of Smurfit-Stone to its public shareholders. They failed to conduct an auction of the company before accepting the Rock-Tenn' bid, they failed to conduct a market test;

b.      they failed to properly value Smurfit-Stone or the synergistic benefits that would accrue to Rock-Tenn in the transaction;

c.      they approved a Proposed Transaction that prohibits solicitation of competing bids;

d.    they approved a Proposed Transaction that interposes an excessive break up fee, which would establish a substantial hurdle to any competing bidders.

81.    Because the Individual Defendants dominate and control the business and corporate affairs of Smurfit-Stone, and are in possession of private corporate information concerning Smurfit-Stone's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Smurfit-Stone which makes it inherently unfair for them to pursue any Proposed Transaction wherein they will reap disproportionate benefits, such as change in control payments, to the exclusion of maximizing shareholder value.

82.    By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other Class members.

83.    As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Smurfit-Stone's assets and businesses and have been and will be prevented from obtaining a fair price for their common stock.

84.    Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Transaction which will exclude the Class from its fair share of Smurfit-Stone's valuable assets and businesses, and/or benefit the Individual Defendants and Rock-Tenn in the unfair manner complained of herein, all to the irreparable harm of the Class, as aforesaid.

85.    The Individual Defendants are engaging in self-dealing, are not acting in good faith toward Plaintiff and the other Class members, and have breached and are breaching their

fiduciary duties to Plaintiff and the Class members.

86.     As Plaintiff and the Class members are seeking preliminary and final injunctive relief, Smurfit-Stone is an active and necessary participant to complete the Proposed Transaction on terms that are unfair to Smurfit-Stone shareholders.

87.     As a result of the Individual Defendants' unlawful actions, Plaintiff and the other Class members will be irreparably harmed in that they will not receive their fair portion of the value of Smurfit-Stone's assets and business and will be prevented from obtaining the real value of their equity ownership of the Company.  Unless the Proposed Transaction is enjoined by the Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class members; will not engage in arm's-length negotiations on the Proposed Transaction terms; and may consummate the Proposed Transaction, all to the irreparable harm of Plaintiff and the Class.

88.     Plaintiff and the Class members have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

## COUNT II

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
**(Against Rock-Tenn Corporation and Sam Transaction, LLC)**

89.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

90.     Rock-Tenn has knowingly aided and abetted the Individual Defendants' wrongdoing alleged herein.  Rock-Tenn has acted and is acting with knowledge or with reckless disregard that the other Defendants are in breach of their fiduciary duties to Smurfit-Stone's public shareholders, has participated in such breaches of fiduciary duties by the Directors of Smurfit-

Stone, and thus is liable as an aider and abettor. Rock-Tenn is also an active and necessary participant in the Individual Defendants' plan to complete the Proposed Transaction on terms that are unfair to Smurfit-Stone shareholders, as Rock-Tenn seeks to pay as little as possible to Smurfit-Stone shareholders.

91.     Plaintiff and the Class members have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands relief, in his favor and in favor of the Class and against Defendants as follows:

A.      Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

B.      Declaring and decreeing that the Proposed Transaction was entered into in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable;

C.      Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Company adopts and implements a procedure or process to obtain a Proposed Transaction providing the best possible terms for shareholders;

D.      Directing the Individual Defendants to exercise their fiduciary duties to obtain a transaction which is in the best interests of Smurfit-Stone's shareholders until the process for the sale or auction of the Company is completed and the best possible consideration is obtained for Smurfit-Stone;

E.      Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof;

F.    Awarding damages to Plaintiff and the Class, in an amount to be determined at trial.

G.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

H.    Granting such other and further relief as this Court may deem just and proper.

Dated:   February 17, 2011

**POMERANTZ HAUDEK
  GROSSMAN & GROSS LLP**

By:   _s / Patrick V. Dahlstrom_              .
                Patrick V. Dahlstrom
Ten South LaSalle Street, Suite 3505
Chicago, Illinois  60603
Telephone: (312) 377-1181
Facsimile:  (312) 377-1184

**POMERANTZ HAUDEK
  GROSSMAN & GROSS LLP**
Marc I. Gross
Jason S. Cowart
Matthew L. Tuccillo
100 Park Avenue
New York, New York 10017
Telephone: (212) 661-1100
Facsimile: (212) 661-8665

**VITA LAW OFFICES, P.C.**
Richard Vita
77 Franklin Street
Boston, MA 02110
Telephone: (617) 426-6566
Facsimile: (617) 249-2119

***Attorneys for Plaintiff***