## UNITED STATES DISTRICT COURT FOR THE

## NORTHERN DISTRICT OF ILLINOIS

```
----------------------------------------x
                                        :
EDWARD J. DABROWSKI, individually and   :
on behalf of all others similarly Situated,  :   C.A. No. 1:11-CV-01136
                                        :
                    Plaintiff,          :
       -against-                        :
                                        :
SMURFIT-STONE CONTAINER                 :   CLASS ACTION
CORPORATION, RALPH F. HAKE, PATRICK     :
J. MOORE, TIMOTHY J. BERNLOHR,          :   AMENDED COMPLAINT FOR
TERRELL K. CREWS, EUGENE I. DAVIS,      :   VIOLATION OF SECTION 14(A)
MICHAEL E. DUCEY, JONATHAN F.           :   OF THE SECURITIES
FOSTER, ERNST A. HABERLI, JAMES J.      :   EXCHANGE ACT OF 1934 AND
O'CONNOR, ROCK-TENN COMPANY, and        :   BREACH OF FIDUCIARY DUTY
SAM ACQUISITION, LLC,                   :
                                        :
                    Defendants.         :
                                        :
----------------------------------------x
```

## AMENDED CLASS ACTION COMPLAINT

Plaintiff Edward J. Dabrowski ("Plaintiff"), on behalf of himself and all other similarly situated public shareholders of Smurfit-Stone Container Corporation (hereafter, "Smurfit-Stone" or the "Company") (the "Class"), brings the following Class Action Complaint against the members of the Board of Directors ("Board") of Smurfit-Stone for breaching their fiduciary duties and against Rock-Tenn Company and Sam Acquisition, LLC, for aiding and abetting the same. The Complaint's allegations are based on the knowledge of Plaintiff as to himself, and on information and belief, including the investigation of counsel and review of publicly available information, as to all other matters.

## NATURE OF THE ACTION

1.      This is a shareholder class action brought by Plaintiff on behalf of common stockholders of Smurfit-Stone to enjoin and/or seek damages resulting from the proposed cash-and-stock acquisition of the publicly owned shares of Smurfit-Stone common stock by Rock-Tenn, as detailed herein (the "Proposed Transaction"), pursuant to an Agreement and Plan of Merger dated January 23, 2011 (the "Merger Agreement"). The Proposed Transaction was valued at approximately $3.5 billion.

2.      In pursuing an unlawful plan to sell Smurfit-Stone for inadequate consideration, as discussed herein, each of the Defendants breached and/or aided and abetted the other Defendants' breaches of their fiduciary duties of loyalty, due care, candor, good faith and fair dealing.  Plaintiff's claims address both the insufficiency of consideration to be paid to Smurfit-Stone common shareholders and the material deficiencies in the merger-related disclosures that have been made by the Company to Smurfit-Stone shareholders, who are being asked to vote on the Proposed Transaction.

3.      As stated in an amended Form S-4 Registration Statement and proxy filed with the Securities and Exchange Commission ("SEC") on March 31, 2011, the Proposed Transaction is scheduled to close at the end of the second quarter of 2011.  Accordingly, this action seeks: (a) equitable relief compelling the Board to properly exercise its fiduciary duties to Smurfit-Stone's shareholders and to enjoin the close of the Proposed Transaction in order to prevent irreparable harm to Plaintiff and the Class members and (b) monetary damages for Plaintiff and the Class.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over the claims asserted herein pursuant to §27 of the Securities Exchange Act (the "Exchange Act") of 1934 for violations of §14(a) and §20(a) of the

Exchange Act and Rule 14a-9 promulgated thereunder. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and 28 U.S.C. §1367. This Court also has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. §1332(a) because the amount in controversy exceeds $75,000.00 and it is between citizens of different states.

5.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a)(1) because Smurfit-Stone resides in this district, pursuant to 28 U.S.C. §1391(a)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this district, and pursuant to 28 U.S.C. §1391(a)(3) because Smurfit-Stone and the Individual Defendants are subject to personal jurisdiction in this district.

## THE PARTIES

6.     Plaintiff is a resident of Massachusetts who is a stockholder of Smurfit-Stone and has held shares at all times relevant to this Action.

7.     Defendant Smurfit-Stone is a Delaware corporation with its principal executive offices located at 222 N. LaSalle Street, Chicago, Il 60601. Smurfit-Stone manufactures paperboard and paper-based packaging. The Company produces containerboard, corrugated containers, kraft paper, bleached paperboard and market pulp, and collects recycled paper. In December 2009, the Company filed a Chapter 11 plan and disclosure statement in Delaware bankruptcy court. In July 2010, the Company completed its financial restructuring and officially emerged from Chapter 11. The Company's stock is listed on the New York Stock Exchange ("NYSE") under the symbol "SSCC." Smurfit-Stone has a total market capitalization of approximately $3.6 billion.

8.     Defendant Ralph F. Hake ("Hake") serves as the Company's non-executive Chairman of the Board of the Directors ("Board"). Hake is a resident of Nevada.

9.     Defendant Patrick J. Moore ("Moore") serves as the Company's Chief Executive Officer and also serves as a Director of the Company.  Moore is a resident of Missouri.

10.     Defendant Timothy J. Bernlohr ("Bernlohr") serves as a Director of Smurfit-Stone.   Bernlohr is a resident of Pennsylvania.

11.     Defendant Terrell K. Crews ("Crews") serves as a Director of Smurfit-Stone. Crews is a resident of Missouri.

12.     Defendant Eugene I. Davis ("Davis") serves as a Director of Smurfit-Stone. Davis is a resident of New Jersey.

13.     Defendant Michael E. Ducey ("Ducey") serves as a Director of Smurfit-Stone. Ducey is a resident of South Carolina.

14.     Defendant Jonathan F. Foster ("Foster") serves as a Director of Smurfit-Stone. Foster is a resident of New York.

15.     Defendant Ernst A. Haberli ("Haberli") serves as a Director of Smurfit-Stone. Haberli is a resident of Illinois.

16.     Defendant James J. O'Connor ("O'Connor") serves as a Director of Smurfit-Stone.  O'Connor is a resident of Illinois.

17.     Defendants Hake, Moore, Bernlohr, Crews, Davis, Ducey, Foster, Haberli and O'Connor are collectively referred to hereinafter as the "Individual Defendants."

18.     As Directors of Smurfit-Stone, each of the Individual Defendants owes the highest fiduciary duties of good faith, loyalty, fair dealing, due care, and candor to Plaintiff and to the other members of the class.  The Individual Defendants are fiduciaries to the Company's shareholders requiring them to exercise their best judgment, and to act in a prudent manner and in the best interests of the Company's shareholders.

19.     Defendant Rock-Tenn Corporation is a Georgia corporation with its principal executive office at 504 Thrasher Street, Norcross, Georgia 30071.  Rock-Tenn Corporation manufactures packaging, including folding cartons, as well as recycled paperboard, and specialty corrugated packaging and display products, with annual net sales of $3 billion.  It has manufacturing operations throughout the United States, Canada, and Mexico.  Its stock is listed on the NYSE under the symbol "RKT."

20.     Defendant Sam Transaction, LLC ("Merger Sub") is a Delaware Limited Liability Company and a wholly-owned subsidiary of Rock-Tenn that was created for the purpose of effectuating the Proposed Transaction.

21.     The Defendants Rock-Tenn Corporation and Sam Transaction, LLC are collectively referred herein to as "Rock-Tenn" unless otherwise indicated and are named as Defendants herein for aiding and abetting the Smurfit-Stone Board's breaches of fiduciary duties and for disseminating materially false and misleading proxy materials concerning the Proposed Transaction.

22.     The Individual Defendants, together with Defendants Smurfit-Stone and Rock-Tenn, are collectively referred to herein as "Defendants."

### INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

23.     Where the directors of a publicly-traded corporation undertake a transaction that will result in either (i) a change in corporate control, or (ii) a break-up of the corporation's assets, the directors have an affirmative fiduciary obligation to obtain the highest value reasonably available for the corporation's shareholders, and if such transaction will result in a change of corporate control, the shareholders are entitled to receive a significant premium.  To diligently comply with these duties, the directors and/or officers may not take any action that:

a.    adversely affects the value provided to the corporation's shareholders;

b.    will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

c.    contractually prohibits themselves from complying with their fiduciary duties;

d.    will otherwise adversely affect their duty to search for and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

e.    will provide the directors and/or officers with preferential treatment at the expense of, or separate from, the public shareholders.

24.    In accordance with their duties of loyalty and good faith, the Individual Defendants, as Directors and/or officers of Smurfit-Stone, are obligated to refrain from:

a.    participating in any transaction in which the directors' or officers' loyalties are divided;

b.    participating in any transaction in which the directors or officers receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

c.    unjustly enriching themselves at the expense or to the detriment of the public shareholders.

25.    Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, are violating their fiduciary duties, including their duties of loyalty, good faith, and independence owed to Plaintiff and other public shareholders of Smurfit-Stone.  The Individual Defendants are engaging in self-dealing, are obtaining for themselves personal benefits not shared equally by Plaintiff and the Class, and are choosing not

to provide shareholders with all information necessary to make an informed decision in connection with the Proposed Transaction. As a result of the Individual Defendants' self-dealing, divided loyalties, and misleading disclosures, neither Plaintiff nor the Class members are being treated fairly in connection with the Proposed Transaction.

26. The Individual Defendants also owe the Company's shareholders a duty of candor, which includes disclosure to the Plaintiff and the Class members of all material facts concerning the Proposed Transaction and, particularly, concerning the fairness of the price offered for the shareholders' equity interest. Defendants are knowingly or recklessly breaching their fiduciary duties of candor and good faith by approving the Proposed Transaction and recommending that Smurfit-Stone shareholders support it, while failing to disclose all material information concerning the Proposed Transaction and failing to explain its merits in light of the substantial red flags, negative facts, and shareholder concerns outlined herein, and/or are aiding and abetting other Defendants' breaches.

## SUBSTANTIVE ALLEGATIONS

### A.     Smurfit-Stone's Emergence From Chapter 11 And Strong Business Performance

27. According to Smurfit-Stone's Form 10-K for the year ended December 31, 2009 (the "2009 10-K"), its operations include 12 paper mills (10 of which are in the U.S.), 110 container plants (90 in the U.S.), 29 reclamation plaints (all in the U.S.), one lamination plant (outside the U.S.) and wood harvesting facilities (inside and outside the U.S.). Smurfit-Stone produces a full range of corrugated containers designed to protect, ship, store and display products made to the merchandising and distribution specifications of its customers, which include a broad range of consumer goods manufacturers. As stated in the 2009 10-K:

> Corrugated containers are used to transport such diverse products as home appliances, electric motors, small machinery, grocery products, produce, books

7

and furniture.  We provide customers with innovative packaging solutions to advertise and sell their products.  In addition, we manufacture and sell a variety of retail ready, point of purchase displays and a full line of specialty products, including pizza boxes, corrugated clamshells for the food industry, Cordeck® recyclable pallets and custom die-cut boxes to display packaged merchandise on the sales floor.  We also provide custom, proprietary and standard automated packaging machines, offering customers turn-key installation, automation, line integration and packaging solutions.  Our container plants serve local customers and large national accounts.  Net sales of corrugated containers for 2009…represented 71%...of our total net sales.

28.     As stated in the 2009 10-K, the Company's containerboard mills produce a full line of containerboard, used primarily in corrugated packaging production, including 3,395,000 tons of unbleached kraft linerboard, 794,000 tons of white top linerboard and 1,844,000 tons of medium in 2009. In 2009, its corrugated container plants consumed 4,406,000 tons of containerboard.  Net sales of containerboard to third parties represented 17% of Smurfit-Stone's total net sales in 2009.   In addition, Smurfit-Stone's "paper mills also produce market pulp, solid bleached liner (SBL), kraft paper, and other specialty products.  We produce southern hardwood pulp, bleached southern softwood pulp and fluff pulp, which are sold to manufacturers of paper products, including specialty papers, as well as the printing and writing sectors.  Kraft paper is used in numerous products, including consumer and industrial bags, grocery and shopping bags, counter rolls, handle stock and refuse bags."

29.     The 2009 10-K also stated that Smurfit-Stone's reclamation operations procure fiber resources for its paper mills and other producers.  The Company operates 29 reclamation facilities that collect, sort, grade and bale recovered paper, and it collects aluminum and plastics for resale to manufacturers.  In addition, it operates a nationwide brokerage system whereby it purchases and resells recovered paper to its recycled paper mills and other producers on a regional and national contract basis. In 2009, its paper mills consumed 1,952,000 tons of the fiber reclaimed and brokered by its reclamation operations, representing an integration level

of approximately 38%.

30. The Company's customer base and revenue stream are well-diversified. As stated in the 2009 10-K:

> We serve a broad customer base. We serve thousands of accounts from our plants and sell packaging and other products directly to end users and converters, as well as through resellers. Our corrugated container sales organization is centralized with sales responsibilities for all converting plants. This allows us to better focus on revenue growth and assign the appropriate resources to the best opportunities. Marketing of containerboard and pulp to third parties is centralized in our board sales group. Total tons of containerboard and market pulp sold to third parties in 2009…were 2,245,000… . Our business is not dependent upon a single customer or upon a small number of major customers. We do not believe the loss of any one customer would have a material adverse effect on our business.

Moreover, "Demand for our major product lines is relatively constant throughout the year, and seasonal fluctuations in marketing, production, shipments and inventories are not significant."

31. As stated in the Company's Form 10-Q for the quarter ended September 30, 2010 (the "Q3 2010 10-Q"), Smurfit-Stone and its U.S. and Canadian subsidiaries filed a voluntary petition for relief under Chapter 11 of the United States Bankruptcy Code ("Chapter 11") in the United States Bankruptcy Court in Wilmington, Delaware on January 26, 2009. On June 21, 2010, the Bankruptcy Court entered an order approving and confirming the Joint Plan of Reorganization and Plan of Compromise and Arrangement for its Canadian subsidiaries (the "Plan of Reorganization"). On June 30, 2010, the Company emerged from Chapter 11, and pursuant to the Plan of Reorganization, it merged with and into its wholly-owned subsidiary Smurfit-Stone Container Enterprises, Inc., which in turn changed its name to Smurfit-Stone Container Corporation and became the Reorganized Smurfit-Stone Container Corporation.

32. In a press release filed with the SEC on July 7, 2010, Defendant Moore, Smurfit-Stone's CEO, exclaimed, "This is an exciting day for Smurfit-Stone. We have successfully completed our financial restructuring in just 17 months and we exit Chapter 11 as a well-

positioned industry leader with a healthier balance sheet and improved cost structure. We are re-energized, committed to serving the needs of our customers and achieving long-term profitable growth for our shareholders."

33.     His expressions of optimism continued a month later, when Smurfit-Stone announced its second quarter 2010 results. In a press release dated August 3, 2010 and filed with the SEC that day as an attachment to a Form 8-K, Moore was quoted as saying:

> We believe our successful financial restructuring positions us for long-term profitable growth. We will continue to focus on what matters - serving our customers, improving margins and delivering shareholder value. Looking ahead, we are confident that continued high operating rates, productivity improvements, higher average prices, and low inventories combined with assumed stable demand will drive significant earnings improvement in the second half of the year.

34.     Moore's optimistic statements accompanied the Company's strong reported operating performance in the same quarter as it emerged from Chapter 11. The press release contained unaudited financials for the second quarter of 2010, which indicated that the Company had: (a) net sales of $1.563 billion for the three months ending June 30, 2010, as compared to $1.461 billion for the three months ending March 31, 2010 and $1.407 billion for the three months ending June 30, 2009, and (b) a net loss (before reorganization items and income taxes) of just $5 million for the three months ending June 30, 2010, as compared to a $48 million loss for the three months ending March 31, 2010. The same press release touted as "Second-Quarter 2010 Highlights" that "The Company successfully emerged from its financial reorganization on June 30 with a significant reduction in leverage and a strong liquidity position" and "Operating results improved significantly due to steady demand improvement, higher capacity utilization, and improved selling prices," among others.

35.     On November 1, 2010, in a press release that was filed with the SEC as an

attachment to a Form 8-K, Smurfit-Stone released unaudited financials for the third quarter of 2010, which indicated that the Company had: (a) net sales of $1.634 billion for the three months ending September 30, 2010, as compared to $1.563 billion for the three months ending June 30, 2010 and $1.417 billion for the three months ending September 30, 2009, and (b) net income (before reorganization items and income taxes) of $121 million for the three months ending June 30, 2010, as compared to a $5 million loss for the three months ending June 30, 2010. Moreover, adjusted EBITDA for the third quarter of 2010 was $239 million, up from $102 million in the second quarter of 2010, and $94 million in the third quarter of 2009. The Company attributed its improved EBITDA to "higher selling prices, reduced maintenance-related downtime and related expenses, lower fiber costs, and improvements in overall operating productivity…"

36.     The Company's string of strong post-bankruptcy results continued in the fourth quarter of 2010. In a press release dated January 23, 2011, which it filed with the SEC as an attachment to a Form 8-K on January 24, 2011, Smurfit-Stone reported net income of $49 million, or $0.49 per diluted share, for the fourth quarter ended December 31, 2010, compared with a net loss attributable to common stockholders of ($6) million, or ($0.02) per share, for the fourth quarter of 2009. Its adjusted EBITDA for the fourth quarter of 2010 was $205 million, up from $67 million in the fourth quarter of 2009. Defendant Moore once again commented on the positive outlook, stating, "Fourth quarter performance was strong, meeting our expectations, and demonstrating that our initiatives to improve productivity and lower costs are enabling us to deliver improvement in earnings, margins and cash flow."

37.     However, rather than permitting the Company's shares to continue to trade freely or growing the business through its reorganized and improved capital structure, the Individual

Defendants, by entering into the Merger Agreement, effectively capped Smurfit-Stone's price at a time when the Company's stock was just recovering from 'recessionary aftershocks' and when it was poised to capitalize on its re-stabilized and encouraging financial outlook. In doing so, the Individual Defendants acted for their own benefit and the benefit of Rock-Tenn, and to the detriment of the Company's shareholders.

**B.** **The Proposed Transaction – A Key Strategic Acquisition for Rock-Tenn**

38.     On January 23, 2011, Smurfit-Stone and Rock-Tenn jointly announced the Proposed Transaction in a press release which the Company filed with the SEC as an attachment to a Form 8-K. The press release announced that the Boards at both companies had approved a definitive agreement pursuant to which Smurfit-Stone will become a wholly-owned subsidiary of Rock-Tenn, for aggregate consideration consisting of 50% cash and 50% Rock-Tenn stock, which was valued at $35 per-share of Smurfit-Stone common stock and gave the transaction an aggregate equity value of approximately $3.5 billion, based on Rock-Tenn's closing price on January 21, 2011. For each share of Smurfit-Stone common stock, Smurfit-Stone stockholders will receive just 0.30605 shares of Rock-Tenn common stock and $17.50 in cash. As part of the deal, Rock-Tenn will assume Smurfit-Stone's net debt and pension liabilities, which the press release said as of December 31, 2010 were purportedly $0.7 billion and $1.1 billion ($0.7 billion after-tax), respectively. The press release stated that the purchase price, inclusive of debt and pension liabilities, represented a multiple of 6.1x Smurfit-Stone's annualized adjusted EBITDA of $820 million for the three months ended December 31, 2010.

39.     The press release stated that Smurfit-Stone will become a wholly owned subsidiary of Rock-Tenn, with Rock-Tenn's shareholders set to own approximately 56% of the combined company, which would be "a $9 billion leader in the North American paperboard

packaging market."  Indeed, it was readily apparent from the January 23, 2011 press release that

Rock-Tenn, which will maintain its Georgia headquarters, was the clear winner and stood to

make out amazingly well from the announced merger.  Rock-Tenn's Chairman and CEO, James

A. Rubright was quoted as saying:

> RockTenn's acquisition of Smurfit-Stone is another major step in our
> transformation of RockTenn to be the most respected company in our business
> with a laser focus on exceeding our customers' expectations and creating long
> term shareholder value. The containerboard and corrugated packaging industry
> is a very good business and U.S. virgin containerboard is a highly strategic global
> asset. With this acquisition, RockTenn's fiber input ratio will be 55% virgin and
> 45% recycled. We believe this transaction provides the greatest possible career
> opportunities for our co-workers from both companies.

40.     The press release also touted Rock-Tenn's post-merger strength, stating, "[W]hen

combined, RockTenn will have 9.4 million tons of total production capacity, including 7.5

million tons of mill production in the attractive containerboard market."  It also identified

strategic advantages that the Proposed Transaction provided Rock-Tenn:  (a) it would permit

Rock-Tenn to leap the forefront of its industry by "[e]xpand[ing] RockTenn's geographic

footprint to the Midwest and West Coast" and making Rock-Tenn the "#2 producer of North

American containerboard" and the "#2 producer of coated recycled board"; (b) it would

accomplish a key strategic adjustment for the company, making its raw materials consist of a

more "[b]alanced fiber input mix with 55% virgin fiber and 45% recycled fiber"; (c) it would

permit Rock-Tenn to harvest from Smurfit-Stone its tax assets and the efficiencies to be achieved

from further post-bankruptcy streamlining, in that post-merger Rock-Tenn will have an

"opportunity to recognize benefits from approximately $500 million of [net operating

losses] at Smurfit-Stone," will have a "[c]onservative capital structure with significant liquidity,"

and will have an "[o]pportunity to improve results through cost reduction and capital

investment."  The press release also disclosed that Rock-Tenn had received $3.7 billion in

committed bank financing, that Wells Fargo Securities had acted as exclusive financial advisor to Rock-Tenn, that Lazard Frères & Co. LLC ("Lazard") was Smurfit-Stone's financial advisor, and that the transaction was expected to close in the second calendar quarter of 2011.

41.     A Rock-Tenn slide presentation entitled "Acquisition of Smurfit-Stone Container Corporation January 24, 2011," which Smurfit-Stone filed with the SEC on January 24, 2011, further touts the primary benefits of the Proposed Transaction for Rock-Tenn's shareholders. First, it underscores that the Proposed Transaction will transform Rock-Tenn into an industry leader overnight.  Under the heading "RockTenn will be the most respected company in our business by:" the Rock-Tenn slides list other ways that the Smurfit-Stone acquisition will spur it to the forefront of its industry.  For instance, the deal means "investing for competitive advantage" because "Smurfit-Stone's assets are well-capitalized, with significant identified opportunities for further profit-improving investments."  Also, it permits "maximizing the efficiency of our manufacturing processes by optimizing economies of scale."  The deal also furthers Rock-Tenn's goal of "systematically improving processes and reducing costs throughout the company" because it "combines RockTenn's Six Sigma continuous improvement method with Smurfit-Stone's Lean Manufacturing method to further optimize manufacturing and administrative processes."  It also furthers Rock-Tenn's goal of "seeking acquisitions that can dramatically improve the business" in that the "acquisition brings increased scale and strong nationwide customer relationships and rebalances RockTenn's fiber sourcing."

42.     Second, the Rock-Tenn slides explain just how critical the Proposed Transaction is from Rock-Tenn's perspective, vis-à-vis its competitors in that its acquisition of Smurfit-Stone will permit it to control a strategically valuable asset of Smurfit-Stone – access to virgin fiber. One of the reasons the slides had characterized the Proposed Transaction as a "Compelling

Strategic Acquisition" was that "US virgin containerboard is a highly strategic global asset." As it turns out, Rock-Tenn is severely deficient in terms of access to this critical asset. As illustrated by the below chart from the Rock-Tenn slides, in 2004, Rock-Tenn's fiber sourcing was 100% recycled, *i.e.* 0% virgin. From 2005-2009, its fiber sourcing vacillated between 72% and 82% recycled. Indeed in the three years before the Proposed Transaction was announced (2008-2010), Rock-Tenn's fiber sourcing was only a flat 18% virgin fiber. However, if the Proposed Transaction closes, Rock-Tenn's fiber sourcing will be rebalanced to 55% virgin and only 45% recycled, a critical strategic balance it was unable to even remotely approach during at least the prior seven years of operations.



### Rebalancing RockTenn's fiber sourcing to 55% virgin / 45% recycled
**Fiber Mix**



43. Third, the Rock-Tenn slides underscore what a financial windfall the Proposed Transaction will be for Rock-Tenn shareholders, due to the tremendous untapped potential to further streamline Smurfit-Stone operations and grow its post-bankruptcy revenues. Among other things, the slides boast that the "Transaction is accretive to RockTenn shareholders on a pro forma historical basis – accretion of 16.5% per diluted RockTenn share." Under the heading "Compelling Strategic Acquisition," they state that "Smurfit-Stone's assets are much lower cost than before their transformation," that there are "[a]mple opportunities to improve cost position

through continued transformation of box plant system and investment in mills," and that "[e]stimated transaction synergies run rate of $150 million within 24 months after transaction close." Under the heading "Well-capitalized, Low-Cost Containerboard Manufacturing Assets," they say "Smurfit-Stone has taken out significant costs over the last three years, with further improvements ahead." The slides also detail how Smurfit-Stone's significant capital investments have driven huge and ongoing increases in efficiency and earnings, in this chart:



44. In addition, the Rock-Tenn slides, implying a level of non-public diligence done by the Rock-Tenn board before reaching agreement, make clear that the efficiency and operating costs of Smurfit-Stone's plants are even better than publicly perceived, in this chart:



## C.     The Process That Led To Proposed Transaction Was Materially Deficient

45.     The process, or lack thereof, that culminated in the Board's agreeing to the Proposed Transaction was materially deficient, failed to accurately gauge the market value of Smurfit-Stone, failed to sufficiently attempt to identify alternative bidders, and prematurely insulated itself against any alternatives to the Rock-Tenn offer.  Instead of being driven by the best interests of the Company's common stockholders, it was driven by personal interests of the Defendants, particularly Defendant Moore's ability (as discussed in greater detail *infra*) to receive a large payout for a change of control transaction offered by the end of March 2011 and consummated by the end of September 2011.

46.     Defendants' rendition of the steps that purportedly led to the Proposed Transaction are set forth in the Amendment No. 2 to the Joint Proxy/Prospectus which Defendants filed with the SEC on Form S-4 on April 19, 2001 and which contained, *inter alia*: (i) a Merger Proposal and vote announcement co-issued by Defendant Moore as Smurfit-Stone's

CEO, along with Rock Tenn's CEO; (ii) a Notice of Special Meeting of Stockholders directed addressed to Smurfit-Stone shareholders issued by Smurfit-Stone's General Counsel "By Orders of the Board of Directors" of Smurfit-Stone; (iii) a description of the Special Meeting and the methods by which Smurfit-Stone shareholders may vote their shares by proxy; (iv) the unanimous recommendation by the Smurfit-Stone Board that Smurfit-Stone shareholders vote in favor of the Proposed Transaction; (v) a Form of Proxy Card addressed to Smurfit-Stone shareholders indicating the manner by which they can vote by mail, telephone, or Internet; (vi) fairness opinions by the financial advisors to Smurfit-Stone and Rock-Tenn in favor of the Proposed Transaction; and (vii) communications to Smurfit-Stone shareholders regarding the Proposed Transaction (filing and filed attachments collectively referenced herein as the "Joint Proxy/Prospectus").[1]

47.     As set forth therein, the first event related to the possibility of a change of control transaction involving the Company after its emergence from bankruptcy happened on September 16, 2010 – just four months before the Board committed to the binding Merger Agreement, replete with preclusive deal provisions counter to shareholder interest (as discussed *infra*), for a $3.5 billion sale of Smurfit-Stone.  On September 16, 2010, an as-yet-unidentified financial buyer (referred to in the Joint Proxy/Prospectus as "Party A") expressed interest in a potential transaction, which it followed in October 2010 with a term sheet for a recapitalization deal and in November 2010 with a written offer for an all-cash acquisition.  Smurfit-Stone and its Board rejected both offers from "Party A."  Throughout, the Individual Defendants failed to shop Smurfit-Stone or to reach out to other potential buyers; indeed, according to the Joint Proxy/Prospectus, a special committee of the Board first considered the possibility of soliciting

---

[1] The Joint Proxy/Prospectus amended and superseded a preliminary joint proxy/prospectus filed on February 25, 2011, and an earlier amended joint proxy/prospectus filed on March 31, 2011.

other bids on December 15, 2010, and it rejected the idea.

48.     The Joint Proxy/Prospectus does not indicate the identity of "Party A," whether "Party A" offered positions to Moore or other existing senior management or offered to retain any existing Board members following the completion of a recapitalization or purchase, whether the recapitalization transaction proposed by "Party A" would have triggered 'change of control' provisions in the employment agreements any of the Individual Defendants, whether Smurfit-Stone at any point in time offered the same preclusive deal terms and due diligence materials to "Party A" that it gave to Rock-Tenn, or the reason why negotiations with "Party A" ultimately fell apart.  Instead, it only states that "Party A" determined not to continue to pursue a potential transaction with Smurfit-Stone on December 21, 2010.

49.     As stated in the Joint Proxy/Prospectus, on December 21, 2010 – just one month before the Board entered into the Merger Agreement – Rock-Tenn, through its financial advisor, Wells Fargo Securities, expressed interest in a stock-for-stock merger.  On January 9, 2011, Rock-Tenn proposed a $32 per share offer in the form of the 50% cash and 50% stock structure used in the Proposed Transaction.  On January 20, 2011 Rock-Tenn raised the offer, using the same structure, to $35 per share, which the Individual Defendants accepted.

50.     The Individual Defendants chose not to maximize shareholder value through a reasonable bidding process, but instead to give the Company away to Rock-Tenn at an unfair price without any attempt to achieve a higher value for shareholders.  On January 10, 2011, a little over two weeks after first being approached by Rock-Tenn, a special committee of the Smurfit-Stone Board decided to forego contacting "Party A" or any other potential buyers and to instead focus solely on the Rock-Tenn proposal.  The Merger Agreement was finalized on January 23, 2011.

51.     Thus, the Board never shopped Smurfit-Stone, never put it to auction, and never did any sort of market test as to its potential acquisition value.  The Board and its financial advisor never contacted a single other potential buyer, including the companies Smurfit-Stone itself identified as peers in SEC filings or any potential financial buyers.  The Board never explored transactional alternatives to the Proposed Transaction.  Indeed, Lazard's fairness opinion letter states, "we were not authorized to, and we did not, solicit indications of interest from third parties regarding a potential transaction with the Company."  Aside from fielding and rejecting "Party A"'s initial offers in late 2010, the Board never did anything – including contacting "Party A" after Rock-Tenn's offer had been received – to secure maximum value for Smurfit-Stone's common stockholders, either from a potential alternative bidder or from Rock-Tenn itself in a competitive bidding scenario.  Worse still, on multiple occasions, the Board specifically considered the possibility of soliciting offers from other parties and expressly declined to do so.  For all these reasons, the Board utterly breached its fiduciary duties in the context of a sale of business transaction.

**D.      Defendants' Joint Proxy/Prospectus Is Materially Deficient and Misleading**

52.     The Joint Proxy/Prospectus is materially deficient and misleading in numerous respects, and deprives Smurfit-Stone shareholders of the opportunity to cast a fully-informed vote regarding the Proposed Transaction.

**1.      The Joint Proxy-Prospectus's Disclosures Regarding Deal Terms and Negotiation History Are Deficient and Materially Misleading**

53.     The Joint Proxy/Prospectus states that Rock-Tenn estimated the fair value of Smurfit-Stone's assets based largely on discussions with Smurfit-Stone's management and a valuation firm.  However, this statement is materially misleading because the Joint Proxy/Prospectus does not disclose whether the values provided by the valuation firm were

consistent with the offered price or the values estimated by Smurfit-Stone management, and does not disclose whether the Smurfit-Stone management providing the value estimates were the same individuals seeking the unique personal financial benefits from the Proposed Transaction alleged herein. Nor does the Joint Proxy/Prospectus disclose the identity of the valuation firm, the assessments that it provided and the bases therefor, or the estimated fair value figures for Smurfit-Stone's assets, whether the valuation firm's work is continuing (the Joint Proxy/Prospectus stated it had not been completed as of the date of filing), and whether the valuation firm has revised any of its preliminary conclusions.

54. The Joint Proxy/Prospectus is also materially misleading because it omits numerous details from its blanket characterizations of "Strategic Considerations Supporting the Transaction" underlying the Smurfit-Stone Board's decision to vote in favor of the Proposed Transaction, including: (a) failure to explain the "current and future landscape of the container industry," "the financial and competitive challenges facing industry participants," and the reasons why the combined company would have a "likelihood" of being "better positioned to overcome these challenges"; (b) failure to explain how, if at all, it was preferable from Smurfit-Stone shareholders' perspective to have a combined company "recognize the benefits from approximately $500 million or more of NOLs of Smurfit-Stone" rather the Company itself reap those benefits on a standalone basis; (c) failure to disclose and explain the "prospects" of both Rock-Tenn and Smurfit-Stone that the Board considered; (d) failure to disclose and explain the "implied value of the merger consideration" figures considered by the Board, the "various dates" used to calculate the merger premium to be paid to Company shareholders, and the "various other Rock-Tenn share prices" used to calculate implied merger consideration value; (e) failure to disclose the valuation(s) of the stock component of the merger consideration examined by the

Board; (f) failure to disclose and substantiate the anticipated future earnings both of Rock-Tenn and of the combined company analyzed by the Board; and (g) failure to disclose and explain what "other strategic alternatives reasonably available to Smurfit-Stone and its stockholders" existed and the bases for the Board's belief that the Proposed Transaction was "more favorable" than those alternatives.

55. The Joint Proxy/Prospectus likewise is materially misleading in that it fails to sufficiently explain numerous "Countervailing Considerations," including, *inter alia*: (a) the specific challenges of integrating Smurfit-Stone and Rock-Tenn; (b) what risks, carrying what likelihood of occurrence, could cause the failure to capture all anticipated cost savings, operational synergies, and "other anticipated benefits" of the merger; (c) the bases for the valuation of Smurfit-Stone's NOLs, including the potential range of $1 - $3 per Company share on a present value basis; and (d) the relative change in value of the stock component of the Proposed Transaction, which is subject to a fixed exchange ratio, through and including the date of the definitive proxy.

56. The Joint Proxy/Prospectus is also materially misleading in its attempt to justify the Board's rejection of its duty to seek a higher share price than Rock-Tenn's insufficient offer.

a. The Joint Proxy/Prospectus concedes that Smurfit-Stone was an attractive takeover target: "Upon its emergence from bankruptcy, Smurfit-Stone did not adopt a classified board or a shareholder rights plan or various other takeover defense measures, and Wall Street analysts have periodically speculated that Smurfit-Stone might be a possible takeover candidate."

b. Yet, the Joint Proxy/Prospectus attempts to justify the Board's repeated, conscious refusal to solicit competing bids to capitalize on the Company's takeover appeal by listing generic, universally applicable concerns that would apply to all situations in which any

22

board of directors shopped any company after deciding to sell "including the risks associated with multiple parties conducting due diligence, the risk of leaks, and the potential impact on customers, current and potential employees and the business that could arise from these risks." These reasons were false and misleading because: (1) Board members owe a duty to shareholders to maximize value in a sale of company despite the inconveniences attached to that activity; if the Board's expressed fears were sufficient to excuse its fiduciary duty, there would *never* be a duty to shop any company after an initial offer had been accepted; (2) the Joint Proxy/Prospectus does not address whether the Company considered mitigating these risks by implementing the same confidentiality measures undertaken previously with "Party A" and with Rock-Tenn; and (3) these reasons lack credibility, insofar as, for instance, the Company was already understood to be a takeover target, so that it is difficult to imagine any real impact on customers or employees.

c.      The statement in the Joint Proxy/Prospectus stating that on January 10, 2011, the Board affirmatively considered and decided against re-contacting "Party A" or any other parties to solicit competing bids to Rock-Tenn's overtures due to the "risk of jeopardizing a potential transaction with Rock-Tenn," is false and misleading because: (1) it omits that any potential jeopardy to Rock-Tenn was the result of the Board agreeing to preclusive deal provisions designed to prevent a superior bid; (2) it omits describing any communication from Rock-Tenn that would support that belief; and (3) it omits to state the contrary – that a superior bid would more likely result in a match or top bid from Rock-Tenn, allowing the market function to maximize the return for Smurfit-Stone shareholders.

**2.      The Joint Proxy-Prospectus's Disclosures Regarding The Fairness Opinions Obtained By Smurfit-Stone And Rock-Tenn Are Deficient and Materially Misleading**

57.    The Joint Proxy/Prospectus includes fairness opinions in favor of the Proposed Transaction by Smurfit-Stone's financial advisor, Lazard, and by Rock-Tenn's financial advisor, Wells Fargo Securities.  Lazard opined that the Proposed Transaction was, from a financial point of view, fair to the Smurfit-Stone common shareholders.  The recitation of Lazard's fairness opinion in the Joint Proxy/Prospectus omits material facts necessary in order to make its statements not false or misleading, and the Joint Proxy/Prospectus's discussion of both fairness opinions is materially misleading to Smurfit-Stone shareholders.

58.    The Joint Proxy/Prospectus is materially misleading and/or omits to state material facts necessary to make its statements not false or misleading, insofar as it fails to disclose and/or sufficiently explain numerous aspects underlying the fairness opinion issued by Lazard, including: (a) the financial forecasts provided to Lazard by Smurfit-Stone related to its business and the financial forecasts provided to Lazard by Rock-Tenn related to its business; (b) the "projected synergies and other financial benefits, including the amount and timing thereof" that management from both Smurfit-Stone and Rock-Tenn anticipated to be realized from the Proposed Transaction; (c) "the potential pro forma financial impact of the merger on Rock-Tenn based on the financial forecasts" provided by Smurfit-Stone's and Rock-Tenn's management ; and (d) whether any of the projections provided to Lazard or to the Board by Company management were prepared by individuals whose interests in the Proposed Transaction differed from the Company's common stockholders, for instance due to the vesting of stock options and/or restrict stock via the Proposed Transaction as further discussed *infra*.  Disclosure of each of these items could materially impact the decision by Smurfit-Stone shareholders as to whether to vote in favor of the Proposed Transaction,

59.    The Joint Proxy/Prospectus is also materially misleading because it does not

explain how Lazard's fairness opinion, upon which the Board based its recommendation in favor of the Proposed Transaction, could determine the fairness of the transaction in light of its intentional omission, by design, of any analysis of a key Smurfit-Stone asset, its NOL carryforwards. Lazard's valuation analyses expressly "excluded any amount of net operating loss carryforwards for U.S. federal income tax purposes or other potential tax benefits." But the Joint Proxy/Prospectus concedes that Smurfit-Stone's $567 million of NOLs had "a potential range of approximately $1 - $3 per Smurfit-Stone common share on a present value basis" and Rock-Tenn's management projected the dollar amount of the NOLs available for use and the corresponding tax shield at a 39% rate for the six months ending September 30, 2011 and the years ending September 30, 2012-2014.

60. The Joint Proxy/Prospectus is likewise materially misleading and/or omits to state material facts necessary to make its statements not false or misleading, insofar as it does not disclose material details regarding numerous parts of Wells Fargo Securities' valuation analysis, including: (a) the financial projections for Smurfit-Stone prepared by Rock-Tenn's management (referred to in the Joint Proxy/Prospectus as the "Smurfit-Stone projections"); (b) the financial projections for Rock-Tenn prepared by Rock-Tenn's management (referred to in the Joint Proxy/Prospectus as the "Rock-Tenn projections"); (c) Rock-Tenn management's view of the prospects of Rock-Tenn; (d) projections of the expected synergies from the merger prepared by Rock-Tenn's management (referred to in the Joint Proxy/Prospectus as "synergies projections"); (e) projections of the utilization of Smurfit-Stone's NOLs prepared by Rock-Tenn's management (referred to in the Joint Proxy/Prospectus as the "NOL projections"); and (f) the "business, financial, and other information" provided to Wells Fargo Securities by the management of both Smurfit-Stone and Rock-Tenn. Disclosure of each of these items could materially impact the

25

decision by Smurfit-Stone shareholders as to whether to vote in favor of the Proposed Transaction.

61.     The Joint Proxy/Prospectus also makes material misrepresentations regarding the comparable companies analyses conducted by both Lazard and Wells Fargo Securities, upon which both investment banks (in part) based their opinion that the transaction was fair and, with respect to Lazard's opinion, upon which the Board (in part) based its recommendation in favor of the Proposed Transaction.  Specifically, the Joint Proxy/Prospectus: (a) omits the fact that both analyses were designed to exclude many key industry participants which Smurfit-Stone has itself acknowledged to be its peers, including more than half of the nine companies it identified as its "Peer Group" in its 2009 10-K (explained in that filing to be "peer group of nine companies that the [Smurfit-Stone Board's Compensation] Committee believes are the most relevant direct competitors of the Company, which have median annual sales of $4.0 billion"); (2) omits the fact that both analyses were designed to exclude many similar manufacturing companies which Smurfit-Stone has itself acknowledged to be generally comparable, including nearly all of the "General Group" of comparable companies, which the 2009 10-K describes as the "broader group of 83 industrial companies of similar size and complexity to the Company."

60.     The Joint Proxy/Prospectus and the fairness opinions do not disclose how inclusion of the entire Peer Group of companies, alone or in conjunction with inclusion of a material portion of the General Group companies, would have affected the specific comparable company calculations performed, and as a result, the resulting range of illustrative value indications per share for Smurfit-Stone common stock against which the Rock-Tenn offer was measured.  In the Lazard analysis, such potentially impacted calculations were the "Adjusted Enterprise Value / EBITDAP" (adjusted enterprise value  / projected earnings before interest,

taxes, depreciation, amortization, and pension expense) analysis and the "Adjusted Enterprise Value / EBITDA" (the same data point unadjusted for pension underfunding) analysis. In the Wells Fargo Securities analysis, such potentially impacted calculations were the "EV/estimated CY 2011 EBITDA" (enterprise value/estimated calendar year 2011 earnings before interest, taxes, depreciation, and amortization") analysis and the "AEV/estimated CY 2011 EBITDA" (enterprise value accounting for after-tax underfunded pension liabilities/ estimated calendar year 2011 earnings before interest, taxes, depreciation, and amortization") analysis. Disclosure of each of these items could materially impact the decision by Smurfit-Stone shareholders as to whether to vote in favor of the Proposed Transaction.

61. The Joint Proxy/Prospectus fails to adequately disclose how pension cost assumptions factored into its comparable company analysis, specifically, the EBITDAP multiple used for each separate comparable company and the specific pension costs Lazard included in its analysis. This is a key omission, since underfunded pension costs represent approximately 14% of the total value of the Proposed Transaction. Its importance to Smurfit-Stone investors is underscored by the fact that Rock-Tenn's CEO previously stated that Rock-Tenn relied upon "pension assumptions" regarding the significantly declining $1.132 billion Smurfit-Stone pension liability and that "A 100 basis point change in the discount rate of the Smurfit plan would reduce the unfunded liability by about $400 million." The Joint Proxy/Prospectus likewise fails to explain the 2011 EBITDA (ignoring pension costs) multiple range employed for the compared companies.

64. Moreover, the statements in the Joint Proxy/Prospectus regarding the comparable transactions analysis conducted by Lazard, upon which Lazard (in part) based its opinion that the transaction was fair and upon which the Board (in part) based its recommendation of the

Proposed Transaction, were materially misleading due to the following omissions:

(a)    The Joint Proxy/Prospectus omits any disclosure of the reason(s) why Lazard chose (or was instructed) to limit its analysis to a handful of transactions in the containerboard industry and the paperboard industry even though that would result in a sample size so low no meaningful conclusion could be drawn.  Lazard analyzed just two transactions from 2010, none from 2009, and just two from 2008.  Yet, Lazard included in its analysis seven transactions from the 1990's.  The Joint Proxy/Prospectus has not adequately explained why Lazard did not analyze more transactions within the past three years, involving General Group companies from other industries.  It also does not explain why Lazard did not include in its analysis all transactions that were analyzed by Wells Fargo Securities.

(b)    The Joint Proxy/Prospectus omits disclosure of the fact that Lazard's decision to compare transaction value as a multiple of EBITDA for the trailing twelve months ("LTM") for these purportedly comparable transactions against the adjusted EBITDA for Smurfit-Stone's fiscal year ended December 31, 2010 is inaccurate and would necessarily have the effect of understating Smurfit-Stone's future potential, because Smurfit-Stone only emerged from bankruptcy in June 2010.

(c)    The Joint Proxy/Prospectus omits disclosure of the deal multiples for each of the compared transactions.  This omission prohibits Smurfit-Stone shareholders from assessing the relevance, or lack thereof, of the transactions analyzed by Lazard.

65.    Furthermore, the statements in the Joint Proxy/Prospectus regarding Lazard's "Discounted Cash Flow" ("DCF") analysis of Smurfit-Stone are materially misleading because they omit any explanation of why Lazard chose to use a different DCF methodology than Wells Fargo Securities, resulting in a dramatically lower valuation of Smurfit-Stone by Lazard.

Specifically, the material, unexplained differences between the DCF analyses by Lazard and Wells Fargo Securities include: (a) Lazard's calculation of the estimated present value of unlevered free cash flows (i) included a subtraction of cash restructuring charges, whereas Wells Fargo Securities' calculation did not and (ii) failed to include the effects of NOLs, whereas Wells Fargo Securities' calculation included an addition of after-tax non-cash stock-based compensation plus NOL tax shield; (b) Lazard's analysis covered the years ending December 31, 2011 through December 31, 2015 whereas Wells Fargo Securities' analysis covered the six months between March 31, 2011 and September 30, 2001 and then fiscal years 2012 through 2015; and (c) Lazard applied a discount rate of 8.0% to 10.0%, whereas Wells Fargo Securities applied a discount rate of 11.5% to 12.5%; (d) Lazard failed to conduct a separate DCF analysis using estimated synergies projections, whereas Wells Fargo Securities did.

66. The effects of these differences in DCF analysis approach, including but not limited to Lazard's decision to exclude NOLs from the calculations, were material. Lazard calculated an implied equity value per Smurfit-Stone share range of between $28.50 to $36.50 and $29.50 to $37.50. By contrast, Wells Fargo Securities calculated a range of illustrative value indications per Smurfit-Stone share of $38.34 to $46.42 (based on the Smurfit-Stone projections prepared by Rock-Tenn management) or $43.87 to $52.72 (based on Synergies Projections by Rock-Tenn management).

67. Statements in the Joint Proxy/Prospectus concerning Lazard's DCF analysis of Rock-Tenn were also materially incomplete. For instance, by using discount rates of 8.0% to 10.0%, Lazard calculated an implied equity value per share of $70.50 to $90.50 for Rock-Tenn. By contrast, Wells Fargo Securities, which used discount rates of 11.5% to 12.5%, calculated a value for Rock-Tenn of just $57.64 to $71.21. The Joint Proxy/Prospectus fails to explain why

Lazard used such a divergent approach from Wells Fargo Securities or why the inputs that Lazard used (or was instructed to use) were chosen, other than having the effect of inflating Lazard's assessment of the value of Rock-Tenn and making the proposed exchange ratio seem more reasonable, thereby making the Proposed Transaction appear to be more "fair."

**E.    The Purchase Price for the Proposed Transaction Is Grossly Inadequate**

68.    The per share consideration offered in the Proposed Transaction is unfair and grossly inadequate for several reasons.

69.    First, the intrinsic value of Smurfit-Stone's common stock is materially in excess of the amount offered, given the Company's recent post-bankruptcy financial performance and its prospects for future growth and earnings, as described in greater detail above.  In addition, in allocating the total merger consideration to Smurfit-Stone's tangible and intangible assets, based on Rock-Tenn management's estimates, the Joint Proxy/Prospectus discloses that Rock-Tenn valued the Company's cash and cash equivalents at $365.5 million and its other working capital at $545 million.  These figures, which should analytically be netted out when assessing the value of the merger consideration from the perspective of Smurfit-Stone shareholders, thereby changing all the multiples used to valuate the deal, will not be adequately compensated for in the Proposed Transaction.

70.    Moreover, the Proposed Transaction specifically fails to properly compensate Smurfit-Stone shareholders for huge net operating loss ("NOL") carryforwards, valuable deferred tax assets that can be used to offset income.  As described in the Joint Proxy/Prospectus,

> As of December 31, 2010, Smurfit-Stone has NOL carryforwards for federal income tax purposes, net of unrecognized tax benefits, of $567 million, resulting in a deferred tax asset for financial statement purposes of $199 million.  These NOLs, which for federal income tax purposes expire in the years 2025 through 2029 are subject to an annual limitation under Section 382 of the Code… .  … Rock-Tenn has estimated the amount of this annual limitation to be approximately

$99 million" subject to certain conditions.

The Joint Proxy/Prospectus asserts that these NOLs have "a potential range of approximately $1 - $3 per Smurfit-Stone common share on a present value basis."  The Joint Proxy/Prospectus fails to substantiate this low a valuation for the NOLs, and even such valuation were valid, it fails to demonstrate that the merger consideration properly compensates Smurfit-Stone shareholders for these NOLs.

71.     Second, on its face, the transaction premium for Proposed Transaction is low compared to recent deals. On December 21, 2009, a Bloomberg article entitled "CEOs paying 56% M&A Premium Shows Stocks May be Cheap," reported that "[t]he average premium in mergers and acquisitions in [2009 in] which U.S. companies were the buyer and seller rose to 56% this year from 47 percent last year [2008]..." Thus, the Proposed Transaction premium (just 27% over the prior day's closing price) is well below the average premium in like transactions during 2009.

72.     Third, the Proposed Transaction undervalued Smurfit-Stone when viewed as a specific strategic acquisition by Rock-Tenn (or other industry competitors).  The Proposed Transaction does not properly allocate the value of the synergies to be achieved via the combined company amongst the Rock-Tenn and the Smurfit-Stone shareholders, in a way that is unfair to the latter.  Moreover, the Proposed Transaction does not acknowledge value for Smurfit-Stone's ability, due to its asset base, to address and cure Rock-Tenn's  deficiencies,  such as the fact that Smurfit-Stone's 65% virgin fiber asset base would instantaneously rebalance Rock-Tenn's raw materials balance in a way that Rock-Tenn could not accomplish on its own and that could only be accomplished through a sizable merger.  The Proposed Transaction utterly fails to compensate Smurfit-Stone shareholders for providing Rock-Tenn this strategic benefit.

73.     For these reasons, analysts following the Company were underwhelmed by the consideration offered in the Proposed Transaction. For example, Richard Lee, an Investment Banking Analyst for Reuters, asserted that the Smurfit-Stone Board "sold-out too early." Additionally, Lee stated:

> At first glance ... $35 is a great premium. But, it is being sold at 6 x EBITDA, which is not a very big premium in the first place. And secondly, they are projecting EBITDA to grow from $580 million last year to almost $900 million this year. So, they are definitely leaving money on the table here.

74.     Further, the Individual Defendants failed to negotiate any protection against the decline in the Rock-Tenn stock component of consideration offered to Smurfit-Stone shareholders in the Proposed Transaction, or even the right to terminate the Proposed Transaction in the event Rock-Tenn stock trades below a certain level. If the Proposed Transaction is not enjoined, Smurfit-Stone shareholders are left with Rock-Tenn stock at whatever price it has declined to at the time of closing, even if that price reflects a significant discount to the price at the time of deal announcement.

**F.      The Individual Defendants Breached Their Fiduciary Duty of Loyalty To Favor The Proposed Transaction Providing Them Unique Benefits Not Shared With the Company's Common Stockholders**

75.     In addition to the inadequacy of consideration, the process that led to the Proposed Transaction suffered from disabling conflicts of interest that violated the Individual Defendants' fiduciary duties to Smurfit-Stone shareholders.  Specifically, the Individual Defendants and Company executives violated their fiduciary duties because they approved the proposed Transaction and recommended that Smurfit-Stone's common shareholders vote in its favor notwithstanding extensive conflicts of interest placing them in different shoes than those stockholders.  Likewise, the financial advisors who submitted fairness opinions in favor of the Proposed Transaction, Lazard (for Smurfit-Stone) and Wells Fargo Securities (for Rock-Tenn)

were materially compromised by the amount and structure of the financial benefits they are to derive if the Proposed Transaction closes. The Individual Defendants further violated their fiduciary duties by so incentivizing Lazard and by relying upon the fairness opinions of financial advisors who were so compromised.

### 1. Personal Windfalls Biased the Individual Defendants

76. The Joint/Proxy Prospectus admits that the Individual Defendants used the Proposed Transaction to garner for themselves extensive personal financial benefits not available to Smurfit-Stone shareholders. Specifically, the unique personal financial interests of the Individual Defendants, undermining their duty of loyalty to Smurfit-Stone shareholders:

> include their designation as [three] Rock-Tenn directors and the fact that the completion of the transaction results in (1) the acceleration of vesting of stock options granted before the date of the merger agreement, (2) continuing exercisability of stock options, (3) the accelerated vesting of restricted stock unit awards granted before the date of the merger agreement, (4) a lump sum cash payment to the chief executive officer of Smurfit-Stone in the event of a third-party offer to acquire Smurfit-Stone (or otherwise engage in a similar transaction) prior to March 30, 2011 that results in a change of control occurring prior to September 30, 2011, (5) the potential payments of severance upon termination in specified circumstances in connection with a change of control, (6) the establishment of a retention pool pursuant to which executive officers and certain key employees will be eligible to receive a retention award that generally will be payable upon completion of the merger, (7) continued indemnification and insurance coverage, and (8) other retention and payments pursuant to existing plans, agreements and arrangements to which certain directors and executive officers are entitled. In addition, on January 30, 2011, Smurfit-Stone made a special bonus payment to Mr. Moore in the amount of $500,000 in recognition of Mr. Moore's service during the post-emergence transition period.

77. These benefits,[2] not shared with Smurfit-Stone's common shareholders interfered with the exercise of the Individual Defendants' fiduciary duties and biased them to favor the

---

[2] As stated in the Joint Proxy/Prospectus: (i) each outstanding Smurfit-Stone stock option that was granted prior to the date of the Merger Agreement will vest and become exercisable as of the effective time of the merger and (ii) the restrictions on each restricted Company stock unit award outstanding at the effective time of the merger, that was granted prior to the date of the Merger Agreement, will lapse at the effective time of the merger and be converted into the right to receive, with respect to each underlying share of Company common stock, the merger consideration on the same terms as other common stock shares.

Proposed Transaction. Specifically, the Individual Defendants who are not Company employees collectively hold restricted stock unit awards correlating to 82,255 underlying shares of Smurfit-Stone common stock convertible into the right to receive the merger consideration at closing of the Proposed Transaction. Moreover, such benefits are also enjoyed by the Company's executives,[3] who influenced the Individual Defendants' consideration of the Proposed Transaction by, among other things, providing management projections used to valuate Smurfit-Stone, Rock-Tenn, and the merger consideration.

78. Regarding Defendant Moore specifically, pursuant to §3(c)(ii)-(iii) of his Amended and Restated Employment Agreement, dated June 30, 2010 and filed with the SEC that day as an exhibit to a Form 8-K, Defendant Moore, Smurfit-Stone's outgoing CEO, was entitled to generous "Change-in-Control Payments" described as follows:

> (c) <u>Special Annual Incentive and Change-in-Control Payments</u>. Subject to the terms and conditions of this Agreement…and provided that the Executive complies with his obligations under this Agreement…and the Executive's employment has not terminated for Cause or without Good Reason (each as defined in this Agreement):
>
> * * *
>
> (ii) in the event (A) of a Change in Control (as defined in this Agreement) during the Employment Period or (B) that, at any time prior to the Retirement Date, the Company receives an offer from a third party to purchase the Company or enter into any other transaction(s) that would constitute a Business Combination (as defined in this Agreement) that results in a Change in Control at any time within fifteen months after the Effective Date (and provided that the Executive participated in the efforts to sell the Company or to otherwise effectuate the Business Combination), the Company shall pay to the Executive, within thirty calendar (30) days after the Change in Control, an additional lump sum amount

---

[3] For instance, based on their equity compensation holdings as of February 18, 2011, the following executives stand to benefit from such vesting of stock options and restricted stock shares: (a) Craig A. Hunt ("Hunt") (126,391 and 39,913 shares of Company stock convertible in the merger relating to stock options and restricted stock unit awards, respectively); (b) Steven C. Strickland ("Strickland") (126,391 shares from options, 39,913 shares from restricted stock unit awards); (c) Kaufmann (70,217 shares from options, 22,174 shares from restricted stock unit awards); and (d) Dention, Michael P. Exner ("Exner"), John L. Knudsen ("Knudsen"), O'Bryan, and Michael R. Oswald ("Oswald") (478,436 shares from options in the aggregate, 151,085 shares from restricted stock unit awards in the aggregate).

equal to (X) the monetary value of equity that the individual holding the positions of President and Chief Operating Officer ("COO") of the Company as of the Effective Date would receive if all of the equity-based compensation that such President and COO received pursuant to and in accordance with the Company's Plan of Reorganization (i.e., that pursuant to the Plan of Reorganization, the President and COO will receive 0.9% of the common shares of the Company issued on the Effective Date on a fully diluted basis, allocated in a restricted stock unit award with respect to 0.22% of such common shares and in an award granting options to acquire 0.68% of such common shares) were fully vested and liquidated at the Change in Control Value (as defined below) reduced by (Y) the amount of the Special Annual Incentive Payment; and

(iii) for purposes of Section 3(c)(ii): (A) "Change in Control Value" means the consideration paid or payable or the value received or receivable with respect to a share of common stock of the Company in connection with the Change in Control (as reasonably determined by the Company), multiplied by the number of shares of common stock, common stock units, or common stock equivalents held by the President and COO of the Company as of the Effective Date; and (B) in the case of an option, stock appreciation right or the equivalent, "Change in Control Value" means the amount described in the preceding Section 3(c)(iii)(A), reduced by the exercise price or strike price of the option, stock appreciation right or the equivalent.

79.     On its face, this provision would have netted Defendant Moore no additional compensation (a) had he not participated in efforts to sell Smurfit-Stone that resulted in (b) a change-in-control offer being made by a third party prior to Moore's retirement (c) for a transaction that closed before September 30, 2011. So, for instance, had Smurfit-Stone waited to close on a merger at any point in time from October 1, 2011 onward, it would have owed Defendant Moore nothing under these provisions. Instead, based on the initial pricing of the Proposed Transaction, Moore stands to reap nearly $60 million if it closes by September 30, 2011. Thus, it is no surprise that Defendant Moore has pushed forward a rushed transaction at breakneck speed with a single preferred bidder, instead of shopping the Company as his fiduciary duties required.

80.     In addition, on February 15, 2011, Defendant Moore entered into an amendment to his Employment Agreement, made effective as of January 1, 2011, so that he will remain

employed by Smurfit-Stone until the effective date of the merger at the monthly gross salary rate of $295,000. Also, on January 31, 2011, Defendant Moore was awarded a special bonus payment by the Board in the amount of $500,000 purportedly in recognition of his service during the "post-emergence transition period." These gratuitous payments to Defendant Moore could add up to nearly $3 million if the Proposed Transaction closed as late as September 2011.

81. The Company also entered into Amended and Restated Employment Security Agreements with certain executives, dated June 30, 2010, whereby if they are terminated without cause or for good reason within two years following a change of control of Smurfit-Stone, such as the Proposed Transaction, then the Company will provide them with: (i) severance, payable over a two-year period, equal to two times the sum of their base salary and the greater of their average annual incentive bonus for the three complete preceding fiscal years or the actual incentive award the preceding year and (ii) the employer portion of their medical and dental insurance premiums for up to two years following termination. For these executives, these contractual protections only arose if a change of control transaction, such as the Proposed Transaction, occurs, and so their existence predisposed these executives to favor the Proposed Transaction and to pressure the Individual Defendants to support it. The executives are Paul K. Kaufmann ("Kaufmann"), Matthew T. Denton ("Denton"), and Mark R. O'Bryan ("O'Bryan").

82. In addition, Steven J. Klinger ("Klinger"), a former director and executive officer of the Company, entered into a consulting agreement on January 1, 2011, which, as amended, provides that he will serve as an independent contractor until the closing date of the Proposed Transaction, providing consulting services upon request, in exchange for the immediate vesting of all his outstanding options and restricted stock unit awards upon a change of control transaction, such as the Proposed Transaction, occurring by September 30, 2011. As of February

18, 2011, Klinger stood to benefit by the conversion into the merger consideration in the Proposed Transaction of 743,478 Company shares relating to stock options and 234,783 Company shares relating to restricted stock unit awards. Based on the initial pricing of the Proposed Transaction, Klinger stands to reap more than $18 million if it closes by September 30, 2011. This arrangement is a valueless proposition for Smurfit-Stone, and amounts to little more than a "me too" payoff to Klinger that permits him to reap the same outrageous windfall, based on the same artificial timelines for a change of control transaction, as Defendant Moore.

83.     Furthermore, pursuant to §1.13 of the Merger Agreement, which the Company filed with the SEC on January 23, 2011 as an attachment to a Form 8-K, the Rock-Tenn Board will be increased by three members, with such positions to be filled by individuals designated by the Smurfit-Stone Board upon consummation of the Proposed Transaction. Thus, three members of the Smurfit-Stone Board will not only cash out their Company shares, but will also maintain employment at the combined company. The three Smurfit-Stone Board members who have been designated spots on the combined entity's Board as part of the Proposed Transaction are Timothy J. Berhlohr, Terrell K. Crews, and Ralph F. Hake. However, the Joint Proxy/Prospectus does not disclose the compensation and benefits that will be offered to each for their continued service.

84.     The Joint Proxy/Prospectus also fails to disclose the identity and structure of the anticipated senior leadership of the combined post-merger company, fails to disclose which Company executives will retain their positions following completion of the Proposed Transaction, and fails to disclose the compensation and benefits that will be paid to each executive who retains employment.

**2.  Large Fees Contingent Upon Closing Biased the Financial Advisors**

85.     Along the same vein, the financial advisors who provided fairness opinions in favor of the Proposed Transaction, Lazard (for Smurfit-Stone) and Wells Fargo Securities (for Rock-Tenn) were materially compromised by the amount and structure of their fees and the benefits they stand to reap if the Proposed Transaction closes.   As disclosed in the Joint Proxy/Prospectus, Lazard is being paid an aggregate fee for its services based on 0.50% of the aggregate consideration paid in the merger, but only $3 million has already been paid.  The rest is payable only upon consummation of the merger and will be lost if shareholders vote against the transaction.  Likewise, Wells Fargo Securities is being paid $11 million for its opinion, but $10 million of that figure is contingent upon the consummation of the merger.  Moreover, Wells Fargo Securities, Wells Fargo Bank, National Association, and WF Investment Holdings, LLC, are among a group of lenders which has committed to provide an aggregate of $3.7 billion in new senior secured credit facilities that will be used to finance the Proposed Transaction, to repay Smurfit-Stone's outstanding indebtedness, and to refinance Rock-Tenn's existing credit facilities.  The collective ability of these affiliated Wells Fargo entities to earn lucrative potential banking profits stemming from the Proposed Transaction further compromised Wells Fargo Securities' ability to provide unbiased transactional advice to Rock-Tenn, and by extension, further rendered its fairness opinion misleading to the shareholders of Smurfit-Stone.

**G.     Preclusive Deal Protection Devices Further Disadvantage Smurfit-Stone Shareholders**

86.     To the further detriment of Smurfit-Stone's shareholders, Defendants agreed to certain onerous and preclusive deal protection devices that operate to ensure that no competing offers will emerge for the Company.  The Joint Proxy/Prospectus admits that "[t]hese provisions limit Rock-Tenn's and Smurfit-Stone's ability to pursue offers from third parties that could result in greater value to…Smurfit-Stone's stockholders."  That is their intent.

87.     First and foremost, Merger Agreement §8.2 provides that if Smurfit-Stone were to

terminate the Merger Agreement in order to enter into a definitive agreement concerning a "Company Superior Proposal," it would have to pay Rock-Tenn an oversized termination fee of $120 million. This provision all but ensures that no rival bid will surface for Smurfit-Stone, solicited or unsolicited. The Joint Proxy/Prospectus admits that "[t]he obligation to make the termination fee payment also may discourage a third party from pursuing an alternative acquisition proposal."

88.     Even assuming that a rival suitor were not completely turned away by this fee in theory, §6.4 of the Merger Agreement, titled "No Solicitation," contains onerous provisions barring the Board and any Company personnel from in any way trying to identify a willing bidder from whom the Company could procure a price in excess of the amount offered by Rock-Tenn.  Specifically, that restrictive section, which operates to the clear detriment of Smurfit-Stone's shareholders, reads in part as follows:

(a)     Upon execution of this Agreement, the Company and its Subsidiaries shall, and shall cause their respective Representatives to, cease and terminate any and all existing activities, discussions or negotiations with any Person with respect to a Company Acquisition Proposal.  The Company shall promptly after the date of this Agreement instruct each Person which has heretofore executed a confidentiality agreement relating to a Company Acquisition Proposal with or for the benefit of the Company to promptly return or destroy all information, documents, and materials relating to the Company Acquisition Proposal or to the Company or its businesses, operations or affairs heretofore furnished by the Company or any of its Representatives to such Person or any of its Representatives in accordance with the terms of any confidentiality agreement with such Person.

(b)     Except as provided in Section 6.4(c), the Company agrees that neither it nor any of its Subsidiaries shall, and that it shall not authorize or permit any of its and their respective Representatives to, directly or indirectly, (i) initiate, solicit, induce or knowingly encourage or facilitate the submission of any inquiry, indication of interest, proposal or offer that constitutes, or may lead to, a Company Acquisition Proposal, (ii) participate in any discussions or negotiations regarding any Company Acquisition Proposal, (iii) furnish any information or data regarding the Company or any of its Subsidiaries to, or afford access to the properties, books and records of the Company to, any Person (other than Parent or

Merger Sub) in connection with or in response to any Company Acquisition Proposal, (iv) enter into any letter of intent or Contract providing for, relating to or in connection with, any Company Acquisition Proposal or any proposal that may lead to a Company Acquisition Proposal (other than a confidentiality agreement as contemplated by Section 6.4(c)), or that requires the Company to abandon, terminate or breach its obligations hereunder or fail to consummate the transactions contemplated hereby, (v) approve, adopt, endorse or recommend a Company Acquisition Proposal, (vi) take any action to make the provisions of any "fair price," "moratorium," "control share acquisition," "business combination" or other similar anti-takeover statute or regulation (including any transaction under, or a third party becoming an "interested shareholder" under, Section 203 of the DGCL), or any restrictive provision of any applicable anti-takeover provision in the Company's Certificate of Incorporation or Bylaws, inapplicable to any transactions contemplated by a Company Acquisition Proposal (and, to the extent permitted thereunder, the Company shall promptly take all steps necessary to terminate any waiver that may have been heretofore granted, to any Person other than Parent or any of Parent's Affiliates, under any such provisions) or (vii) resolve, propose or agree to do any of the foregoing.

89. The remainder of Merger Agreement §6.4 acts to ensure that, even if a rival bidder theoretically were to surface notwithstanding the contractual bar preventing the Company and its employees from identifying such a suitor, the Company would cooperate with Rock-Tenn to thwart the rival bid. Specfically, pursuant to Merger Agreement §6.4(f), Smurfit-Stone is required to notify Rock-Tenn within 24 hours, both orally and in writing, of its "receipt of any *bona fide* inquiries, discussions, negotiations, proposals or expressions of interest with respect to a Company Acquisition Proposal"; must disclose the identities of the third parties making the inquiry/offer; and must provide Rock-Tenn with copies of all documentation thereof. Pursuant to Merger Agreement §6.4(e), Rock-Tenn is entitled to a three-day period within which to make a counter-offer that would trump any unsolicited "Superior Proposal."

90. Rock-Tenn will of course be able to match any such unsolicited offer because it is contractually granted unfettered access to the details of the unsolicited offer, in its entirety, thereby eliminating any leverage that Smurfit-Stone would have as a result of receiving the unsolicited offer. Thus, to the extent that the Merger Agreement even arguably permits an

'auction,' if one were to somehow arise, the cards are stacked in favor of Rock-Tenn's emerging the winner, by piggy-backing on the due diligence of the foreclosed second bidder and offering up the minimum additional consideration necessary to supersede its offer. Effectively, these provisions act to dissuade any potential rivals from making a meaningful bid in the first place.

91.     Indeed, in its Form 10-K for the fiscal year ended December 31, 2010, filed with the SEC on February 15, 2011 (the "2010 10-K"), the Company admitted that the foregoing provisions, including the onerous termination fee, will dissuade potential rival suitors and therefore will prevent it from maximizing shareholder value through a change of control transaction. The 2010 10-K, in a section detailing extensive "Rock-Tenn Merger Agreement Risk Factors," included the following (emphasis added):

> **The Merger Agreement limits our ability to pursue an alternative acquisition proposal to the Merger and requires Smurfit-Stone to pay a termination fee of $120 million if it does.**
>
> The Merger Agreement prohibits Rock-Tenn and us from soliciting, initiating, encouraging, or facilitating certain alternative acquisition proposals with third parties, subject to exceptions set forth in the Merger Agreement. The Merger Agreement also provides that we are required to pay a termination fee of $120 million if the Merger Agreement is terminated under certain circumstances in connection with a third party initiating a competing acquisition proposal for Smurfit-Stone. ***These provisions limit our ability to pursue offers from third parties that could result in greater value to our stockholders*** than the value resulting from the Merger. ***The termination fee may also discourage third parties from pursuing an acquisition proposal*** with respect to Smurfit-Stone.

92.     These preclusive deal protection devices, independently and in conjunction with one another, illegally restrain the Company's ability to solicit or engage in negotiations with any third party regarding a superior proposal. Even assuming a potential bidder could stomach the $120 million termination fee, the Company would be so procedurally bound to favor Rock-Tenn by the processes set forth in the Merger Agreement that it would not meaningfully have a "fiduciary

out."  Likewise, these provisions will foreclose the new bidder from providing the needed market check of Rock-Tenn's inadequate offer.  Thus, Plaintiff seeks injunctive relief to prevent the irreparable injury that Company shareholders will continue to suffer absent judicial intervention.

**H.**    **Smurfit-Stone Shareholders Have Voiced Outrage At the Proposed Transaction**

93.    Some sophisticated investors – even with the unlawfully misleading disclosures made to date – already understand that the deal is not in shareholder interest.  Investment funds claiming to own 9% of Smurfit-Stone's outstanding common stock (96% of which they owned before the Proposed Transaction was announced) wrote a scathing letter to the Board dated February 2, 2011, that was publicly disclosed, in which they expressed their intention to vote against the Proposed Transaction (the "Shareholder Concerns Letter").   The signatories were Third Point LLC, Royal Capital Management, L.L.C., and Monarch Alternative Capital LP (together, the "Dissenting Shareholders").

94.    The Shareholder Concerns Letter expresses the Dissenting Shareholders' "belie[f] that the acquisition by Rock-Tenn substantially undervalues the Company and we are acutely disappointed that the Board of Directors is willing to throw in the towel on the significant upside inherent in the Company's assets."  It continues, "To add insult to injury, it appears that the Company did not run a sale process, apparently in violation, or at least in ignorance, of your duties to shareholders to seek the best price available. …[W]e cannot help but wonder whether Mr. Patrick Moore's employment contract, which is set to expire on March 31st of 2011, played any part in pushing for this sale, given that he personally stands to earn a windfall in excess of $15 million as a result of the Merger."  It points to the fact that Rock-Tenn's stock price was trading up 18% since the announcement as an indication that the market believes Rock-Tenn "is getting a steal."  It also sets forth five reasons why "The Proposed Transaction Represents a

Significant Discount to Precedent Valuations."

95.     First, it indicates that the Proposed Transaction might have a Total Enterprise Value to Adjusted EBITDA multiple of 5.1x, instead of the 6.1x announced multiple, because: (a) Rock-Tenn failed to account for the Company's sizable existing net operating loss ("NOL") asset of $500 million (worth ~$190 million, or ~$1.88 per share on a 'tax effected basis') or its potential $650 million additional NOLs (which would be worth ~$250 million more, or ~$2.45 per share on a 'tax effected basis') and (b) Rock-Tenn admittedly used the Company's "seasonally weakest" fourth quarter of $205 million in adjusted EBITDA to annualize Smurfit-Stone's "run rate" at $820 million instead of a more appropriate $938 million figure that was estimated by a Goldman Sachs analyst in a January 9, 2011 report.

96.     Second, whether the multiple is 5.1x or 6.1x, the Shareholder Concerns Letter argues that it is too low. It indicates that Lazard, the Board's financial advisor, had testified in the summer of 2010 during Smurfit-Stone's bankruptcy plan confirmation hearing that precedent containerboard transactions over the last decade had a median ratio of 7.7x. Such a multiple, combined with the EBITDA calculations discussed above, would yield a $59 per share price.

97.     Third, the Shareholder Concerns Letter questions the sales process, pointing to comments by Rock-Tenn's CEO that "this transaction was exclusively negotiated on a one-on-one basis" and that Rock-Tenn "[doesn't] like to do transactions that are in a process" as pre-proxy indications that there was no competitive bidding process employed. It points to Defendant Moore's change of control payment, which it calculated as being as high as $19 million, and the fact that Smurfit-Stone's officers will receive $42 million related to the merger, as reasons why they were incentivized to sell the Company so quickly on the cheap.

98.     Fourth, the Shareholder Concerns Letter points out that Smurfit-Stone, at worst,

could have remained a standalone enterprise which, if managed properly, could have eliminated inefficiencies (such as having two headquarters), increased margins, and developed its own valuable assets. As evidence of this standalone potential, the Shareholder Concerns Letter points to Rock-Tenn's CEO's comment that "the opportunities for…investments in the Smurfit mill system are basically unlimited with very, very high paybacks" and his remarks that rising interest rates could cause Smurfit-Stone's underfunded pension plan to rebound with a far lower capital contribution that currently calculated.

99.     Finally, the Shareholder Concerns Letter indicates that Rock-Tenn's status as a 'forced buyer' of strategically valuable virgin fiber capacity, which constitutes 65% of Smurfit-Stone's asset base, along with the considerable synergies of a potential combined company, should have forced Rock-Tenn to pay a substantially higher premium than that which is set forth in the Merger Agreement.

100.     For such a strong, coherent, extensive and material opposition to the Proposed Transaction to have emerged in such a short period of time, even before any proxy materials were made public, is striking. It is further indication that the Proposed Transaction disadvantages Smurfit-Stone shareholders and is the result of the breaches of fiduciary duty alleged herein.

101.     Moreover, instead of answers, Smurfit-Stone shareholders are being served even more questions about the validity of the merger through the Company's most recent public statements. For instance, the 2010 10-K, filed February 15, 2010, sets out a litany of potential obstacles to the merger that would prevent it from achieving the purported benefits to Smurfit-Stone's shareholders. Specifically, the 2010 10-K states:

**If the Merger is completed, the combined company may not be able to successfully integrate the business of the Company and Rock-Tenn and therefore may not be able to realize the anticipated benefits of the Merger.**

At the effective time of the Merger, each share of our common stock issued and outstanding immediately prior to the effective time of the Merger will be converted into the right to receive $17.50 in cash and 0.30605 of a share of Rock-Tenn Class A common stock, par value $0.01 per share (collectively, the "Merger Consideration").

Because a portion of the Merger Consideration consists of Rock-Tenn common stock, realization of the anticipated benefits in the Merger will depend, in part, on the combined company's ability to successfully integrate the businesses and operations of Rock-Tenn and us. The combined company will be required to devote significant management attention and resources to integrating its business practices, operations, and support functions. The challenges the combined company may encounter include the following:

- combining diverse product and service offerings, customer plans, and sales and marketing approaches;

- preserving customer, supplier, and other important relationships and resolving potential conflicts that may arise as a result of the merger;

- consolidating and integrating duplicative facilities and operations, including back-office systems;

- addressing differences in business cultures, preserving employee morale, and retaining key employees while maintaining focus on providing consistent, high-quality customer service and meeting its operational and financial goals; and

- adequately addressing business integration issues.

The process of integrating Rock-Tenn's and our operations could cause an interruption of, or loss of momentum in, the combined company's business and financial performance. The diversion of management's attention and any delays or difficulties encountered in connection with the Merger and the integration of the two companies' operations could have an adverse effect on the business, financial results, financial condition, or stock price of Rock-Tenn (as the combined company following the Merger). The integration process may also result in additional and unforeseen expenses. There can be no assurance that the contemplated expense savings and synergies anticipated from the merger will be realized.

102. In light of all the foregoing, the injunctive relief sought herein is appropriate and

necessary in order to protect the rights of Plaintiff and the Class of Smurfit-Stone shareholders he seeks to represent.

## CLASS ACTION ALLEGATIONS

103.    Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(a) and (b)(2) and (b)(3), individually and on behalf of all other common stockholders of Smurfit-Stone who are or will be harmed by Defendants' wrongful actions, as more fully described herein (the "Class"). Excluded from the Class are Defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with them and their successors in interest.

104.    This action is properly maintainable as a class action.

105.    The Class is so numerous that joinder of all members is impracticable. According to the Joint Proxy/Prospectus, there were 97,539,612 shares of Smurfit-Stone common stock outstanding as of the record date of April 8, 2011. The actual number of shareholders of Smurfit-Stone is believed to be in the thousands and will be ascertained through discovery.

106.    There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual Class member. The common questions include the following:

A.    whether defendants have breached their fiduciary duties to the Class in connection with the Proposed Transaction;

B.    whether the Individual Defendants have breached their fiduciary duty to secure and obtain the best price reasonable under the circumstances for the benefit of plaintiff and the other members of the Class in connection with the Proposed Transaction;

C.    whether defendants have breached any of their other fiduciary duties to

plaintiff and the other members of the Class in connection with the Proposed Transaction, including the duties of good faith, diligence, honesty and fair dealing;

        D.     whether the defendants have improperly impeded or erected barriers to discourage other offers for the Company or its assets; and

        E.     whether plaintiff and the other members of the Class would suffer irreparable injury were the transactions complained of herein consummated.

107.    Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff does not have any interests adverse to the Class.

108.    Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature who will fairly and adequately protect the interests of the Class.

109.    The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class.

110.    Plaintiff anticipates no difficulty in the management of this litigation as a class action. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

111.    Defendants have acted, or refused to act, on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## COUNT I

### BREACH OF FIDUCIARY DUTY
### (Against Smurfit-Stone and the Individual Defendants)

112.    Plaintiff incorporates by reference and realleges each and every allegation

contained above, as though fully set forth herein.

113.    The Individual Defendants have violated their fiduciary duties of care, good faith loyalty, and candor owed to the public shareholders of Smurfit-Stone.

114.    By the acts, transactions and courses of conduct alleged herein, the Individual Defendants, individually and acting as a part of a common plan, are attempting to unfairly deprive Plaintiff and the other Class members of the best reasonably available transaction in exchange for their investment in Smurfit-Stone.

115.    The Individual Defendants have violated their fiduciary duties by entering into a transaction with the Rock-Tenn without regard to the fairness of the transaction to Smurfit-Stone shareholders.

116.    The Individual Defendants failed to exercise the care required, and breached their duties of loyalty and good faith, owed to the shareholders of Smurfit-Stone because, among other reasons:

        a.      they failed to take steps to maximize the value of Smurfit-Stone to its public shareholders. They failed to conduct an auction of the company before accepting the Rock-Tenn' bid, they failed to conduct a market test;

        b.      they failed to properly value Smurfit-Stone or the synergistic benefits that would accrue to Rock-Tenn in the transaction;

        c.      they approved a Proposed Transaction that prohibits solicitation of competing bids;

        d.      they approved a Proposed Transaction that interposes an excessive break up fee, which would establish a substantial hurdle to any competing bidders.

117.    Because the Individual Defendants dominate and control the business and

corporate affairs of Smurfit-Stone, and are in possession of private corporate information concerning Smurfit-Stone's assets, business and future prospects, there exists an imbalance and disparity of knowledge and economic power between them and the public shareholders of Smurfit-Stone which makes it inherently unfair for them to pursue any Proposed Transaction wherein they will reap disproportionate benefits, such as change in control payments, to the exclusion of maximizing shareholder value.

118.    By reason of the foregoing acts, practices and course of conduct, the Individual Defendants have failed to exercise ordinary care and diligence in the exercise of their fiduciary obligations toward Plaintiff and the other Class members.

119.    As a result of the actions of the Individual Defendants, Plaintiff and the Class will suffer irreparable injury in that they have not and will not receive their fair portion of the value of Smurfit-Stone's assets and businesses and have been and will be prevented from obtaining a fair price for their common stock.

120.    Unless enjoined by this Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class, and may consummate the Proposed Transaction which will exclude the Class from its fair share of Smurfit-Stone's valuable assets and businesses, and/or benefit the Individual Defendants and Rock-Tenn in the unfair manner complained of herein, all to the irreparable harm of the Class, as aforesaid.

121.    The Individual Defendants are engaging in self-dealing, are not acting in good faith toward Plaintiff and the other Class members, and have breached and are breaching their fiduciary duties to Plaintiff and the Class members.

122.    As Plaintiff and the Class members are seeking preliminary and final injunctive relief, Smurfit-Stone is an active and necessary participant to complete the Proposed Transaction

on terms that are unfair to Smurfit-Stone shareholders.

123.    As a result of the Individual Defendants' unlawful actions, Plaintiff and the other Class members will be irreparably harmed in that they will not receive their fair portion of the value of Smurfit-Stone's assets and business and will be prevented from obtaining the real value of their equity ownership of the Company.  Unless the Proposed Transaction is enjoined by the Court, the Individual Defendants will continue to breach their fiduciary duties owed to Plaintiff and the Class members; will not engage in arm's-length negotiations on the Proposed Transaction terms; and may consummate the Proposed Transaction, all to the irreparable harm of Plaintiff and the Class.

124.    Plaintiff and the Class members have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury which defendants' actions threaten to inflict.

## COUNT II

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against Rock-Tenn Corporation and Sam Transaction, LLC)

125.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

126.    Rock-Tenn has knowingly aided and abetted the Individual Defendants' wrongdoing alleged herein.  Rock-Tenn has acted and is acting with knowledge or with reckless disregard that the other Defendants are in breach of their fiduciary duties to Smurfit-Stone's public shareholders, has participated in such breaches of fiduciary duties by the Directors of Smurfit-Stone, and thus is liable as an aider and abettor.  Rock-Tenn is also an active and necessary participant in the Individual Defendants' plan to complete the Proposed Transaction on terms that are unfair to Smurfit-Stone shareholders, as Rock-Tenn seeks to pay as little as possible to

Smurfit-Stone shareholders.

127.    Plaintiff and the Class members have no adequate remedy at law.

## COUNT III

**(Against Defendants for Violations of §14(a) of the Securities Exchange Act of 1934
and Rule 14a-9 Promulgated Thereunder)**

128.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

129.    Defendants prepared the false or misleading Joint Proxy/Prospectus, which (a) contains statements which, at the time and in the light of the circumstances under which they are made, is false or misleading with respect to material facts and (b) fails to disclose material facts and information necessary in order to make the statements made, in light of the circumstances under which they were made, not false or misleading.

130.    The Joint Proxy/Prospectus was prepared, reviewed and/or approved by Defendants, who disseminated it by way of its filing with the SEC by Rock-Tenn.  By way of the Joint Proxy/Prospectus, Smurfit-Stone and the Individual Defendants directly solicit and permit the use of their name to solicit the proxy vote of Smurfit-Stone shareholders in favor of the Proposed Transaction.

131.    Among the material facts that the Joint Proxy/Prospectus misrepresents and/or omits are information about the unfair sales process for the Company, the value and inadequacy of the consideration offered in the Proposed Transaction, and the actual intrinsic value of the Company's assets both as a stand-alone entity and as a merger partner for Rock-Tenn.

132.    By disseminating and/or allowing their names to be used in the Joint Proxy/Prospectus, Defendants have allowed Smurfit-Stone shareholder votes to be solicited by means of material false and/or misleading statements in violation of §14(a) of the Exchange Act

and SEC Rule 14a-9 promulgated thereunder.

133.    The statements identified herein are material in that a reasonable shareholder would consider them important in deciding how to vote on the Proposed Transaction.   In addition, a reasonable investor would view a full and accurate disclosure as significantly altering the total mix of information made available in the Joint Proxy/Prospectus and in other information reasonably available to shareholders.

134.    By reason of the foregoing, Defendants have violated §14(a) of the Exchange Act and SEC Rule 14a-9(a) promulgated thereunder.

135.    Because of the material false and misleading statements and omissions in the Joint Proxy/Prospectus, Plaintiff and the other Smurfit-Stone shareholders are threatened with irreparable harm, rendering money damages inadequate.   Failure to correct the false and misleading statements and omissions in the Joint Proxy/Prospectus will deprive Plaintiff and the other Smurfit-Stone shareholders of their right and entitlement to case a fully informed vote regarding the Proposed Transaction.    Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected prior to the vote on the Proposed Transaction.

**COUNT IV**

**(Against the Individual Defendants for Violation of §20(a) of the Exchange Act of 1934)**

136.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

137.    This Count is pled against the Individual Defendants in the alternative to Count III.

138.    The Individual Defendants acted as controlling persons of Smurfit-Stone within the meaning of §20(a) of the Exchange Act as alleged herein.   By virtue of their positions as

officers and/or Directors of Smurfit-Stone, their participation in and/or awareness of the Company's operations, and/or their intimate knowledge of the Proposed Transaction and of the false or misleading statements in the Joint Proxy/Prospectus, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including with regards to the content and dissemination of the various statements alleged herein to be false and/or misleading.

139.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Joint Proxy/Prospectus and other statement alleged herein to be false or misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

140.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular Proposed Transaction giving rise to the securities violation as alleged herein, and exercised the same.  The Joint Proxy/Prospectus at issue contains the unanimous and explicit recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in the making of the Joint Proxy/Prospectus, which was predicated upon that recommendation and would not have been filed with the SEC but for that recommendation.

141.    In addition, as the Joint Proxy/Prospectus sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing and approving the Proposed Transaction.  The Joint Proxy/Prospectus purports to describe the various issues and information that they reviewed and considered – descriptions which were written with input from the Individual Defendants.

142.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated §14(a) of the Exchange Act and SEC Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Individual Defendants are liable pursuant to §20(a) of the Exchange Act.  As a direct and proximate result of the Individual Defendants' conduct, Plaintiff and the other Smurfit-Stone shareholders will be irreparably harmed.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands relief, in his favor and in favor of the Class and against Defendants as follows:

A.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel;

B.    Declaring and decreeing that the Proposed Transaction was entered into in breach of the fiduciary duties of the Individual Defendants and is therefore unlawful and unenforceable;

C.    Enjoining Defendants, their agents, counsel, employees and all persons acting in concert with them from consummating the Proposed Transaction, unless and until the Company disseminates to shareholders a proxy that is accurate and complete, curing the misrepresentations and omissions identified herein, and adopts and implements a procedure or process to obtain a Proposed Transaction providing the best possible terms for shareholders;

D.    Directing the Individual Defendants to exercise their fiduciary duties to obtain a transaction which is in the best interests of Smurfit-Stone's shareholders until the process for the sale or auction of the Company is completed and the best possible consideration is obtained for Smurfit-Stone;

E.      Rescinding, to the extent already implemented, the Proposed Transaction or any of the terms thereof;

F.      Awarding damages to Plaintiff and the Class, in an amount to be determined at trial.

G.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees; and

H.      Granting such other and further relief as this Court may deem just and proper.

Dated:   April 22, 2011

POMERANTZ HAUDEK
  GROSSMAN & GROSS LLP

By:   _/s / Joshua B. Silverman_____.
          Joshua B. Silverman

Patrick V. Dahlstrom
Ten South LaSalle Street, Suite 3505
Chicago, Illinois  60603
Telephone: (312) 377-1181
Facsimile:  (312) 377-1184

POMERANTZ HAUDEK
  GROSSMAN & GROSS LLP
Marc I. Gross
Jason S. Cowart
Matthew L. Tuccillo
100 Park Avenue
New York, New York 10017
Telephone: (212) 661-1100
Facsimile: (212) 661-8665

VITA LAW OFFICES, P.C.
Richard Vita
77 Franklin Street
Boston, MA 02110
Telephone: (617) 426-6566
Facsimile: (617) 249-2119

*Attorneys for Plaintiff*